## JACOB KRAFT AND PHILIP KIMMEL v. PETER SMITH.

ERROR TO THE COURT OF COMMON PLEAS OF BLAIR COUNTY.

Argued May 23, 1887—Decided October 3, 1887.

1. When one buys real estate at sheriff's sale under a verbal agreement with the debtor, as whose property it is sold, to hold it in trust for him with a right in the latter to redeem, the transaction is not a mortgage and does not give to the debtor the rights of a mortgagor.
2. The fraud which will convert the purchaser of land at a sheriff's sale into a trustee ex maleficio of the debtor, must have been fraud existing at the time of the sale, by which the title was procured.
3. In an ejectment, where it is sought to recover on the ground that the defendant, having purchased the land at sheriff's sale, is a trustee ex maleficio for the plaintiff as whose property the land was sold, unless the evidence of the facts from which the fraud is to be found be clear, explicit and unequivocal, the court should instruct the jury to find for the defendant.
4. Barnet v. Dougherty, 32 Pa. 371; Kellum v. Smith, 33 Pa. 158, and Kistler's App., 73 Pa. 393, followed.

Before MERCUR, C. J., GORDON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.; PAXSON, J., absent.

No. 81 January Term 1886, Sup. Ct.; court below, No. 108 April Term 1883, C. P.

This was an action of ejectment brought on April 20, 1883, by Peter Smith against Jacob Kraft and Philip Kimmel to recover a lot of ground in Altoona.

On April 27, 1878, the lot in dispute was sold at sheriff's sale as the property of Peter Smith, the plaintiff in the ejectment, to Lawrence Kimmel, who received the sheriff's deed therefor on August 26, 1878. At the date of this suit Philip Kimmel was in possession as vendee of Lawrence Kimmel of one half the lot, and Jacob Kraft was the tenant of Lawrence Kimmel of the other half.

On the trial, in rebuttal of the defendant's case, made out by showing title under the sheriff's sale on a valid judgment against the plaintiff, the latter adduced testimony tending to show: That at and immediately before the sheriff's sale of his property Lawrence Kimmel, the purchaser, made a verbal arrangement with the plaintiff, under which Kimmel was to purchase and, on repayment by the plaintiff of the amount of the bid and certain other claims against him which Kimmel was to discharge, Kimmel was then to reconvey the property to the plaintiff; that this agreement was to be reduced to writing and signed by the parties the evening of the day of the sheriff's sale at the office of Smith's attorney, but that Kimmel the purchaser did not attend and the agreement was not afterwards prepared or executed; that other persons who had intended to bid were induced by information of the said arrangement to refrain; that on the day of sale, Smith procured the railroad tickets for the party, including Lawrence Kimmel, to attend the sheriff's sale at Hollidaysburg and return, and had paid for the lunch for the party; that the property was knocked down for $335 to Smith's attorney, who, relying upon the arrangement, directed the sheriff's deed to be made to Kimmel, and that the property was then worth from $1,200 to $1,600; that soon afterwards Smith removed with his family to Pittsburgh, leaving his son-in-law Storm and wife in possession, and Kimmel got possession in November, 1878; that in July or August, 1879, after Philip Kimmel had purchased half of the lot, but before he had made any improvements on it, the plaintiff made a tender of $600 to Lawrence Kimmel and demanded a reconveyance which was refused, that sum being sufficient as claimed by Smith to reimburse the purchaser.

On the day of trial, the plaintiff renewed his tender of $600 to the defendants and on its refusal paid the same into court.

The character of the testimony relating to the arrangement referred to, to the agreement which was to have been put in writing, and to the terms upon which the reconveyance was to have been made, is shown in the opinion of this court.

On the part of the defendant, testimony was adduced tending to show that Lawrence Kimmel purchased the property primarily to save a claim he held against the plaintiff; that on the day of the sheriff's sale he had verbally agreed to give the plaintiff a chance to re-purchase, but that he was to be paid $25.00 per month and to receive the rent, $8.00 per month in addition; it was not arranged that the agreement was to be reduced to writing; that no payments either by Smith or by the tenant were made; that about Christmas, 1878, Mrs. Smith in behalf of her husband saw Kimmel and told him that they had failed in their agreement, but that if he would wait till Easter following they would pay the whole amount, and if they did not then pay they would let the property go; that no payments at all were ever made and no tender, until in June, 1879, when a part of the lot had been sold to Philip Kimmel who had then nearly completed a dwelling house upon it, when the $600 tender was made and refused.

Following are certain points of the plaintiff with the answers thereto:

1. If the jury find that before the sheriff's sale a verbal agreement was entered into between Lawrence Kimmel and Peter Smith, that Kimmel should buy the property in at sheriff's sale for Smith, to be reconveyed to Smith when he should repay Kimmel the purchase money paid by Kimmel and other debts of Smith paid by Kimmel; that this agreement should be reduced to writing and signed before Kimmel should obtain the sheriff's deed; that Smith, on the faith of above understanding, paid the railroad fares of Mr. Heinsling and Lawrence Kimmel and his son Philip to and from Hollidaysburg, while attending the sheriff's sale; that the property was knocked down to Mr. Heinsling as the attorney for Smith, with the understanding that the above agreement was to be carried into effect; that Kimmel, by reason of this understanding, and by representing that he intended to buy the property for Smith, prevented bidding, and obtained the property at a

price much below its value; that Kimmel afterwards obtained the sheriff's deed without having entered into the written contract; that some time after the sheriff's sale Smith or his attorney tendered to Kimmel an amount sufficient to reimburse him the money he had advanced, and demanded a reconveyance of the property; that Kimmel declined the tender, refused to reconvey, and asserted title absolutely in himself; then Kimmel is a trustee ex maleficio for Smith, and the plaintiff is entitled to recover.

Answer: If all the facts asserted in this point are proven to your satisfaction, this point is affirmed. You will bear in mind, however, that fraud is never to be presumed, but always to be proved by satisfactory evidence.

6. The alleged arrangement between Mrs. Smith and Kimmel that the money should be repaid to Kimmel at or about Easter of 1879, and if not paid by that time then Smith to make no further claim, even if such arrangement were proved, is of no effect, because not made with Smith himself, nor by his authority, and because there was no consideration for it.

Answer: Affirmed.[4]

7. If the jury find that it was agreed between Smith and Kimmel at or about the time of the sheriff's sale, that the property should be knocked down to Heinsling, and the sheriff's deed made to Kimmel; that Kimmel should pay the purchase money, and the record debts of Smith; that Kimmel should hold the property of Smith until Smith should repay the money advanced by Kimmel, and then reconvey to Smith, then the transaction was a mortgage, and if Smith tenders to Kimmel an amount sufficient to pay him the amount advanced, with interest, allowing for what Kimmel received for rents on the property, the plaintiff is entitled to recover.

Answer: Affirmed; if the jury are satisfied that all the facts alleged have been proven.[2]

Following are certain points of the defendants with the answers thereto:

1. That under the act of assembly of April 22, 1856, all declarations or creations of trusts in lands are required to be in writing and signed by the party holding the title therefor, else are void; except resulting trusts such as the law implies.

Answer: Denied as applying to this case.[1]

8. That if the testimony of Philip Kimmel, Lawrence Kimmel and Mrs. Mary Soler is believed, viz.: " that Mrs. Smith, representing her husband, stated that if they did not pay or reimburse Kimmel by Easter they would not want the property," and the money was not paid before that time, or the 1st of May to which Lawrence Kimmel extended it, that this would be evidence of Smith having abandoned the purpose of redeeming the property and the verdict must be for the defendants.

Answer: This point raises a question of fact for the jury. Its weight is entirely for them.[3]

11. That the evidence in the case fails to make out such a fraud upon part of Lawrence Kimmel as to invalidate the sheriff's sale, and the verdict must therefore be for defendants.

Answer: Refused.[6]

The court, ROBERT L. JOHNSON, P. J., in the charge to the jury, reviewed the testimony relating to the arrangement under which Lawrence Kimmel became the purchaser, and the knowledge of it on the part of other proposed bidders and proceeded:

It is alleged here on the part of the plaintiff that the evidence shows that this arrangement prevented Karl Olmes from purchasing, prevented another party, Richard Shontz, from attending the sale, and that the property was bought at only a fraction of its real value, in pursuance and in consequence of this arrangement. [You will recollect the value put on the property by the plaintiff's witnesses. Some three or four witnesses, I believe, were called, who estimate the value at that time at from $1,200 to $1,300. The witnesses called by the defendants fix it at $800 or $900. It seems that the appraisement, which is in evidence here, shows that it was valued by the appraisers at $900. The property really brought but little over one third of its value, according to the defendants' counsel, and but little over one fifth of its value according to the evidence of the plaintiff.] [5]

Now, these are alleged as facts and evidence to convince the jury, when taken with the admission of Philip Kimmel to Mr. Olmes of his intention and purpose; this is presented to the jury, and it is claimed by the counsel for the plaintiff that it establishes such fraud and artifice on the part of the defendant as would vitiate the sale, and render him a trustee—as would

Charge of Court below.

defraud Peter Smith and render Lawrence Kimmel a trustee ex maleficio for him, to hold the property in trust for him.

Now, gentlemen, in pursuance of that theory, the plaintiff has submitted a point to the court to be presented to the jury; and you will consider this, as you will the other points that shall be read here, in reference to the facts as they present themselves before you. . . . . .

It is the duty of jurors to reconcile testimony where the reconciliation of testimony is possible. Where it is irreconcilable, where you cannot pass upon it all with a regard to the truth of all the witnesses, then it is for you to decide according to what you believe the weight of the testimony is. On this point we have stated that in order to make out fraud, artifice; in order to make out bad faith, you must believe from this testimony that it occurred in the very inception of the title; that the whole transaction was fraudulent and intended to be fraudulent, and that while seeming to purchase for Peter Smith, Lawrence Kimmel intended at the time of the purchase to secure the title to himself. All this testimony that I have just referred to bears upon that question. If this testimony itself, or the weight of it, does convince you that this was done through fraudulent design, and that by that fraud, purchasers were prevented from attending the sale; that that was part of the fraud and that the failure to carry out the terms by the written agreement, was part of it; if you believe that all these things were part of that same fraud and intention by artifice, falsehood, or fraud to get the possession to himself while he assumed to act as the agent or friend of another, then his title would avail him nothing, and he would hold that title in trust for the plaintiff. You will recollect that "the laboring oar" is with the plaintiff to satisfy you of this. . . . . .

The jury returned a verdict for the plaintiff for the lot in dispute, and judgment being entered the defendants took this writ. After the affidavit and recognizance for the writ was filed in the court below, on motion it was ordered that the plaintiff have leave to take out of court the sum of $600 paid in by him as a tender.[7]

The errors assigned were as follows:

1. The refusal of the defendants' first point.[1]
2. The answer to the plaintiff's seventh point.[2]

3. The answer to the defendants' eighth point. [3]

4. The affirmance of the plaintiff's sixth point. [4]

5. The part of the charge embraced in [ ] [5]

6. The refusal of the defendants' eleventh point. [6]

7. The order permitting plaintiff to lift the tender. [7]

*Mr. H. M. Baldridge* and *Mr. A. V. Dively*, for the plaintiffs in error.

1. The plain meaning of § 4, act of April 22, 1856, P. L. 533, is that a trust in land can now be proved in no other way than by writing. The proviso excepts from its operation resulting trusts such as the law implies, and these are raised only from fraud in obtaining the title or from payment of some part of the purchase money when title is acquired: Barnet v. Dougherty, 32 Pa. 371.

2. There was error in stating in answer to the plaintiff's seventh point that the transaction was nothing more than a mortgage: Fox v. Heffner, 1 W. & S. 372; Jackman v. Ringland, 4 Idem 150.

3, 4. The defendants' eighth point was put hypothetically. The answer gave no instruction as to what weight should be attached to the evidence if believed. And the answers to the plaintiff's sixth point and the defendants' eighth point—upon the same subject matter—are utterly inconsistent and irreconcilable. The latter part of the plaintiff's point assumes as a fact that the arrangement made by Mrs. Smith as to the final payment of the advances, was without the authority of her husband and without consideration; while defendants contended that the testimony showed she was in the whole transaction acting as her husband's agent.

5. The defendants produced testimony that at the time of sale the property was not worth more than from $700 to $900; and the evidence showed that the bid was only $335, and Kimmel was to pay debts, taxes, etc., aggregating as actually paid some $635, or near the full value of the property.

6. The evidence failed to make out such a case of fraud as to justify its submission to the jury. To make a purchaser at sheriff's sale a trustee ex maleficio, the evidence must be clear, explicit and unequivocal: Kistler's App., 73 Pa. 393; McGinity v. McGinity, 63 Pa. 38; Plumer v. Guthrie, 76 Pa.

441. And the fraud which will convert the purchaser into a trustee ex maleficio must have been at the time of the sale, not in any subsequent breach of a mere promise: Kellum v. Smith, 33 Pa. 164. In an equitable ejectment, a recovery by a vendee is not of right but of judicial grace. The trial judge, if the case be insufficient in equity, should take it from the jury: Elbert v. O'Neil, 102 Pa. 305; especially where the plaintiff has induced his opponent to believe that the contract was rescinded: Washabaugh v. Stauffer, 81* Pa. 497; and in cases of laches and material change in the circumstances: Dohnert's App., 64 Pa. 311; Porter v. Dougherty, 25 Pa. 405.

7. The record shows receipt of plaintiff for the $600 paid into court as a tender, so that he now has a verdict for the property and the money paid in for the defendants to entitle him to it.

*Mr. D. J. Neff* (*Mr. N. P. Mervine* with him), for the defendants in error:

1. The case is in all essential respects similar to Faust v. Haas, 73 Pa. 295, wherein this court held that the court below should have submitted the case to the jury upon the whole evidence, with instructions that if they believed Haas obtained possession of the sheriff's deed mala fide, their verdict should be for the defendant, which is precisely the way in which the court below in this case submitted it to the jury. Kimmel obtained the deed by trick or artifice and by betraying the confidence reposed in him: Heath's App., 100 Pa. 1; Christy v. Sill, 95 Pa. 387; Cook v. Cook, 69 Pa. 443; Gilbert v. Hoffman, 2 W. 66.

2. The defendants' first point laid down merely an abstract proposition which had no direct application to the case. The plaintiff based his allegation of a trust distinctly on the ground of fraud and artifice in obtaining the legal title. The denial of the point worked no injury, for the reason that the court in answering other points and in the general charge, instructed the jury substantially as to the effect of the act of 1856.

3. There was no exception to the answer to the plaintiff's seventh point. And if the arrangement was that Kimmel was to buy in the property for Smith, pay Smith's debts, take the

title in his own name, and Smith to have the right to redeem on reimbursing Kimmel at the rate of $25 per month and the rents, then the transaction was a mortgage, and "once a mortgage, always a mortgage."

4. As to the third and fourth assignments: Mrs. Smith had no authority, express or implied, even when transacting business for her husband, to release or extinguish any equity he may have had, or to divest his estate in the land in controversy.

OPINION, MR. JUSTICE GREEN:

The third assignment of error must be sustained, because the reply made by the learned court below to the defendants' eighth point was no answer to it. The defendants presented certain hypothetical facts in the point and requested the instruction of the court upon the effect of those facts if believed by the jury. The answer given by the court was, "This point raises a question of fact for the jury; its weight is entirely for them." This was no answer at all, as it gave the jury no instruction as to what they might or should do if they believed the facts submitted in the point. There was evidence supporting the truth of the facts stated and therefore the defendants were entitled to an affirmance of the point if the facts were believed. But the answer was neither an affirmance nor a denial, nor did it submit any question whatever to the jury, and it was therefore erroneous.

The answer to the plaintiff's sixth point was still more erroneous, because it contained a binding instruction upon the very same facts covered by the defendants' eighth point, and took away from the jury the consideration of those facts, notwithstanding the court also told the jury the facts were for them. The answers to these two points are in direct antagonism and therefore misleading, but they are also incorrect on their merits. For this reason the fourth assignment of error is also sustained.

The second assignment must be sustained because the transaction in question was in no point of view a mortgage; and in fact it was presented in the general charge as a sale exclusively and not as a mortgage; and to say it was both, upon the same facts, was necessarily confusing and misleading to the jury. The plaintiff could only recover on the theory that

Lawrence Kimmel was a trustee ex maleficio for the plaintiff because of fraud in the making of the parol agreement to convey the land to the plaintiff. Upon that theory the case was tried, and there was none other upon which it could have been tried. The sale to Kimmel was a judicial sale made by the sheriff, who of course had no power to accept a mortgage. The character of such a transaction is well determined in the case of Fox v. Heffner, 1 W. & S. 372, where we said: "It is now settled by repeated decisions that if one buys property at sheriff's sale and verbally agrees to hold it in trust for the defendant, with a right of redemption in defendant within a limited period, it is a contract resting in parol merely and not transferring any title in the land." It was claimed in that case that the transaction might be regarded as a loan of money, but we said: "The deed was from the sheriff, who could not, by law, accept a mortgage; he was bound to make an absolute deed to the purchaser of all the title of the debtor to the land." In the case of Jackman v. Ringland, 4 W. & S. 150, which was also a judicial sale, we said: "To hold this to be a mortgage, when in truth it is a sale, would be a virtual repeal of the act of frauds; besides the same attempt was made in Fox v. Heffner without success."

The first assignment is sustained because the defendants' first point is undoubtedly true as a legal proposition, and it is certainly applicable to the facts of this case.

The eleventh point of the defendants raised a question which was vital to the whole of the plaintiff's case. It was in these words: "That the evidence in the case fails to make out such a fraud upon part of Lawrence Kimmel as to invalidate the sheriff's sale and the verdict must therefore be for defendants." The answer was, "Refused." After a patient and critical study of the whole testimony in the case, we are of opinion that this point should have been affirmed and the cause withdrawn from the jury. The status of this class of cases is well defined by the decisions of this court. In construing the fourth section of the act of 22d April, 1856, we held in Barnet v. Dougherty, 32 Pa. 371, that the plain meaning of the enactment is that a trust in land can now be proved in no other way than by writing. The proviso excepts from its operation resulting trusts such as the law implies, and these are raised

only from fraud in obtaining the title, or from payment of some part of the purchase money when title is acquired. In the case of Kellum v. Smith, 33 Pa. 158, we held that a promise to purchase real estate at a sheriff's sale, and to convey it to the defendant in the execution whenever he should repay to the purchasers their advances to him, does not raise a resulting trust in favor of the defendant. Such agreement vests in the former owner no interest in the land which can be taken in execution by a judgment creditor, unless there was fraud in the purchase. Mr. Justice STRONG, in delivering the opinion of this court and referring to the ruling of the court below in regard to raising a resulting trust upon a parol agreement at a sheriff's sale to hold in trust for the defendant, said: " A resulting trust cannot be raised in such a way. Such a trust can arise only from the payment of the purchase money or from fraud in the purchase; fraud perpetrated by the grantee. Here the purchase money of the sheriff's sale was paid by Bell & Co., and consequently the beneficial interest as well as the legal estate went to them. Had there been fraud in that purchase they might have been held trustees ex maleficio. But the fraud which will convert the purchaser at a sheriff's sale into a trustee ex maleficio of the debtor, must have been fraud at the time of the sale. Subsequent covin will not answer, any more than subsequent payment of the purchase money will convert an absolute purchase into a naked trust. When the purchaser at a sheriff's sale promises to hold for the debtor and afterwards refuses to comply with his engagement, the fraud, if any, is not at the sale, not in the promise, but in its subsequent breach. That is too late. It is abundantly settled that equity will not decree such a purchaser to be a trustee, unless there is something more in the transaction than the mere violation of a parol agreement." Both of the foregoing decisions were reaffirmed by this court in Kistler's App., 73 Pa. 393, in which Mr. Justice AGNEW fully reviewed the whole subject and all the authorities, and also defined the character of the testimony which is necessary to establish a trust ex maleficio in this class of cases. On pp. 399–400 he said: " The evidence to establish a resulting trust, especially one arising ex maleficio, which is an imputation of fraud, should be clear, explicit and unequivocal: McGinity v. Mc-

Ginity, 63 Pa. 38; Nixon's App., 63 Pa. 279; Lingenfelter v. Richey, 62 Pa. 123."

Applying the foregoing principles to the facts of the present case, let us inquire whether there is enough to sustain the verdict of the jury and therefore to warrant the submission of the cause to them. It is entirely undisputed, indeed it is alleged by the plaintiff, that Lawrence Kimmel purchased the property in question at sheriff's sale; that he paid the whole of the purchase money, none of it being contributed by the plaintiff; and that the agreement of Kimmel to buy and hold the property for Smith, the plaintiff, was a verbal agreement only. It is alleged by Smith, but denied by Kimmel, that a written agreement was to be signed after the sale, but none such ever was signed, and the case therefore stands upon a verbal agreement only. In order to bring the case within the decisions, an allegation of fraud in the inception of the title is set up. It is founded upon three alleged matters of fact, to-wit: (1) That trickery was practiced in obtaining the sheriff's deed, without first executing a written agreement; (2) Payment of part of the expenses, and (3) Inducing persons not to bid at the sheriff's sale who otherwise would have done so.

The last of these is the most important and, if it was sustained by testimony, the case was properly given to the jury. The only bidders alleged to have been deterred were Karl Olmes and Richard Schantz. As to Olmes he does not pretend to say upon his examination in chief that he was induced by Kimmel to abstain from bidding, or even to be absent from the sale. On cross-examination he testified as follows: " Q. You never saw either of the Kimmels before the sale at all? A. No sir; I saw them but I never spoke to them before or since on this subject; not since excepting his son came over and asked me if I was subpœnaed, and I told him I was. Q. There was nothing said about not going to the sale or anything of that kind? A. No sir, not to me. Nobody tried to keep me away from the sale." Schantz testified to a conversation, not with Lawrence Kimmel who bought the property at sheriff's sale, but with Philip Kimmel and his wife, as follows: " Q. State whether you intended to go to the sheriff's sale and if you didn't go, why you didn't go? A. Well, Mr. Kimmel and Mrs. Kimmel came to my place and said we ought

not to run this property up, they were going to pay us; on account of them going to buy it in for the Smiths, wanted to buy it as low as they can on account they were poor. Q. Did you go to the sale? A. No sir." Having said that Mrs. Philip Kimmel and her husband had told him about wanting to buy the property in for Smiths, he was asked: " Q. Did ever old Mr. Kimmel tell you that? A. No sir, he never came to my place. Q. They did not tell you not to bid? A. That's what they said, they didn't want to put up the property because they wanted to buy it back for Smiths. Q. And this Mrs. Kimmel and Philip told you and you never saw Lawrence, the man that bought it? A. No sir. Q. Were you going to buy? A. Well I guess we would have saved that bit of money, it went so cheap. . . . . . Q. Did you ever ask old Mr. Kimmel afterwards? A. No sir. Q. You never said anything to him about the claim and your money? A. No sir. Q. Had you any agreement with him that you were to be paid? A. No sir." It will be seen at once that the foregoing testimony of these two witnesses' fails entirely to connect the purchaser, Lawrence Kimmel, with any effort to deter bidders. Neither of them ever had any conversation with him in regard to the sale. Olmes says that nobody kept him from the sale, and Schantz fails to say that he intended to be present at the sale or to bid any sum whatever for the property. There is therefore no foundation in the testimony for the allegation that the purchaser induced any one to be absent from the sale or deterred any one from bidding.

As to the alleged payment of part of the expenses, it amounts to nothing but an assertion by the Smiths, that some one or more of them paid railroad fares for themselves and the Kimmels to go from Altoona to Hollidaysburg to attend the sale, and paid also for some beer and cheese lunch. As to the lunch they admit that Philip Kimmel " set up " the entertainment the same as they did; and as to railroad fares the Kimmels deny it and say they paid their own fares; but, however the fact may be, it is immaterial since these fares constituted no part of the costs or expenses of the sale.

In regard to the verbal agreement that a written agreement should be signed, the evidence is so indefinite, so uncertain, so shadowy as to what its terms were to be, and is so emphati-

cally denied by both the Kimmels, that it cannot for one moment be regarded as either clear, explicit or unequivocal. As to what the agreement was, the only persons who claimed to have directly communicated with Lawrence Kimmel were Mrs. Smith and her husband, the plaintiff. The wife was by far the most active person in the business. She describes the conversation which it is claimed constituted the agreement thus: " Q. What was said there about the property? A. They said they were going to buy it in, going to sign an agreement and as soon as they had their money back I should take it back again; they said, 'we don't want to cheat you out of your property, we want to save it.' They were to sign an agreement at Heinsling's office the same evening, the same day. Q. Who said they were going to buy it in for you? A. Both, and Phillip said 'Now, Mrs. Smith we will buy it in for you and we are going to sign it over to your children and you can't bail anybody nor your old man either.' . . . . . Q. How long were you to have to buy this property back? A. I didn't make no arrangement at all how long or how I would pay: I just told him, 'I leave it in your hands; he could take it out in rent till he had his money out, what belongs to him and if he has it double: he shouldn't be a loser he should gain on it and if he gets it double out I was satisfied too so he just would give me my property back when he has his money all out.'"

This almost unintelligible jargon discloses the most profound uncertainty as to the essential features of any agreement. How long was the plaintiff privileged to redeem? What was Kimmel the purchaser to pay? Was his own debt to be included in the redemption? How was he to be paid, in rents only or in an absolute payment, or payments directly by the Smiths? A long cross-examination developed that other moneys were to be paid besides the bid at the sheriff's sale, certain debts owing by Smith, some of record and others not of record; but it is absolutely impossible to determine from the testimony what these debts were. Some were denied in whole and some in part, not one was stated with any certainty. Whether Lawrence Kimmel's own claim was to be paid was left in complete uncertainty, and hence his right to require its payment cannot be known. Being asked about this debt she said: " Yes sir, we did owe him a store bill but he had no judg-

ment or anything at all in : I gave her a big iron kettle and a kraut cutter and a whole lot of things that way : she didn't say anything after that, that I owed her anything or not; how they make the bill that big I don't know: they never asked me to pay, they didn't say a word about it." This is but a sample of much other testimony of a similar sort. How any jury could determine what amount should be paid or tendered, or how the purchaser at the sheriff's sale could know what amount he had a right to claim, before his obligation to reconvey arose, it is impossible to understand.

Peter Smith's testimony was still more uncertain than his wife's. When asked to tell what took place he said : " When my property was sold by the sheriff it was not my deed, it was my son-in-law. Lawrence Kimmel came to my house and said ' I will buy it in for yon : I don't like to see you lose your home : I will take it so long and rent it till it pays the whole thing.' . . . . . Q. Did you ever talk with Kimmel before you went to Heinsling? A. No sir, never; that's all I talked to Kimmel: he came to me and says, I will buy it in and take it in rent, that's all I know. . . . . . I owed him a little store bill; my woman settled it; I don't want to cheat him out of a cent. Q. How much were you to pay him back a month? A. I never made a bargain that way : he said he would take it in rent. Q. How much rent? A. I don't know, I never asked him. Q. How much did you expect the house to rent for? A. That Dutch woman gave me $2 a month." As to whether there was to be a writing he was asked: " Q. When you came over that morning to go to Hollidaysburg did you hear anything about a writing? A. No sir, no writing; I never put my finger to no paper or pen. Q. There wasn't to be any writing about it? A. No sir: I thought he was a good Christian; that's all what I know. . . . . . Q. Did you sign a paper? A. I signed no paper. Q. You never saw one prepared? A. No sir. Q. You don't know what was to go in it? A. That is all I know. Q. You don't know what was to go in the paper that Heinsling was to draw up? A. He says he would go over there to Heinsling and make an agreement. Q. What was to go in that agreement? A. I don't know. I gave him my deed and insurance paper: he said he wanted to sign that paper: he

bought it in for me : that is all I know." This witness is the plaintiff in the case. He seeks to recover land purchased and paid for by the defendant at a public sheriff's sale, in an action brought almost five years after the sale and just before the statute of limitations was about to close upon it. The foundation of his action is a verbal agreement with the purchaser for the conveyance of the property to him. Such an agreement being insufficient to confer title, it is alleged there was to be a written agreement. When inquired of upon that subject he first says there was to be no writing. Afterwards he says that a writing was to be signed, but he does not know what was to go in it. Upon such testimony as the foregoing he asks a court and jury to give him the land purchased by the defendant after part of it has been sold to another and costly improvements erected thereon. The tender made when a conveyance was demanded, was totally insufficient to compensate for the improvements; and it is impossible to tell from the testimony whether it was sufficient to repay the defendant the amount to which he was entitled under any phase of the evidence. The testimony of Mr. Heinsling in no manner relieves the case of these insuperable difficulties. He says he advised that a writing must be prepared and that the parties were to come to his office the evening of the sale and that the defendant never came. What the specific contents of the agreement were to be, he does not say. He is sure the judgments were to be paid but thinks other debts were not; but what the actual agreement of the parties was he does not state and probably does not know, as they had already met before he saw them and come to whatever understanding they did have. He fails entirely to explain why he did not notify the sheriff not to deliver the deed because the written agreement was not signed, and why he did not apply to the court to set aside the sale on the ground of fraud, if there was any fraud, and why he did not at least call upon the defendant to execute a written agreement if one was to be signed.

Apart from the entirely inadequate evidence as to what the verbal agreement was, we fail to discover any evidence of fraud or trickery on the part of the defendant in obtaining the sheriff's deed. Neither Heinsling nor any other witness testifies to any distinct agreement by Kimmel that he would enter

into a written agreement and abstain from taking the sheriff's deed until he had done so. In point of fact the deed remained with the sheriff a considerable time after it was acknowledged and it was not acknowledged until four months after the sale, and there is not a particle of evidence that it was obtained secretly or surreptitiously. Not the slightest effort was made to prevent the defendant from getting it, nor at any time after the day of sale was any demand made upon him to execute a written agreement or to abstain from taking the deed. In view of these entirely undisputed facts it is impossible to understand how there could have been any real engagement to enter into a written agreement at all. The evidence of the plaintiff, his wife and Heinsling, the only persons who testify on this subject, is entirely unsatisfactory and insufficient to support the allegation of fraud; and, without considering the positive denial of the defendant and his son, we cannot regard it as either clear, explicit or unequivocal. In our opinion it would be doing a grave injustice to permit a purchaser at sheriff's sale to be deprived of his land upon such testimony as is contained in this case, and we think the jury should have been instructed to render a verdict for the defendants.

Judgment reversed.