## CONRAD HUFFNAGLE v. J. W. BLACKBURN.

APPEAL BY DEFENDANT. FROM THE COURT OF COMMON PLEAS
OF WESTMORELAND COUNTY.

Argued October 8, 1890—Decided November 3, 1890.

1. Where recovery is sought in ejectment, on the ground that the defendant is a trustee ex maleficio for the plaintiff, under a purchase of the land as the plaintiff's at a sheriff's sale, if the plaintiff's version of the agreement alleged be indefinite and the conduct of the parties more consistent with that of the defendant, the proof is insufficient to establish the trust.

2. In such an action, if it be made to appear that before the suit was brought to enforce such trust, more than five years had elapsed after the plaintiff had notice that the parol agreement upon which his rights depended was repudiated by the defendant, the defendant's title acquired by the sheriff's sale will not be disturbed by proof of the agreement made at the sale: § 6, act of April 22, 1856, P. L. 533.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

Nos. 127, 128 October Term 1890, Sup. Ct.; court below, Nos. 540, 541 May Term 1887, C. P.

On May 2, 1887, Conrad Huffnagle brought two actions of ejectment against James W. Huffnagle, to recover two lots in the town of West Newton. At issue.

Statement of Facts.

The two causes were tried together on November 30, 1889, when evidence was adduced by the plaintiff, in substance, as follows:

Upon process issued to May Term 1879, upon a judgment against Huffnagle, the plaintiff, in favor of one Croushore, the lots in dispute belonging to the plaintiff were advertised at sheriff's sale. The plaintiff called upon one Houseman, living at Greensburg, and requested him to buy in the lots for him, but Houseman could give no definite reply at that time. Before the sale, however, Blackburn, the defendant, living in the country, suggested to the plaintiff that he would buy the lots in for him, convey them to him, and take a judgment for the purchase money. On May 17, 1879, the plaintiff and defendant came together to Greensburg, to attend the sheriff's sale to be held on that day, the defendant buying the railroad tickets. At Greensburg, the plaintiff met Houseman, who told him that he had informed Mr. J. J. Hazlett, the plaintiff's attorney, that he had arranged to buy in the lots for the plaintiff, if the purchase money did not exceed $2,300, when the plaintiff replied that he had not received notice of that fact from Mr. Hazlett, and that Blackburn, the defendant, had offered to buy in the lots for him. Houseman, as he testified for the plaintiff, then went to Blackburn and asked him if he was to buy the lots for Huffnagle, and the defendant replied that he was, in consequence of which Houseman refrained from bidding. A short time before the sale was to take place, the defendant suggested to the plaintiff to bring Mr. Hazlett down to Mr. Edgar Cowan's law office. As to what there occurred the plaintiff testified:

"So I went down, and afterward Mr. Hazlett come, and so was Mr. Blackburn there, and Mr. Cowan and my wife. Then Mr. Cowan says to Mr. Hazlett, well, how does that thing stand with Huffnagle's property? Well, Mr. Hazlett he told him about so and so, he says. Well, Mr. Cowan, he says, we must look our enemy right in the face; we want everything clear; everything. Then Mr. Hazlett he took his paper and explained everything. Well, then, afterwards Mr. Cowan, he says, it is all right; he says, well, Mr. Huffnagle, you want Mr. Blackburn to buy your property in for you? I said, that is what I understand; that he bought the property back for us on a judgment. Q. Who said this that you have just mentioned? A. I said that the

understanding was that Blackburn—Objected to. Q. We do
not want the understanding; just what was said. Was Mr.
Blackburn there? A. Mr. Blackburn was there. Mr. Cowan
he says, he has got a notion to take a pen and write some things;
then he put the pen away and says, no, that is all right now;
now Mr. Blackburn is to buy your property and give it back
on a judgment for you and you have to pay him his fee. I said
that is all right, I will pay his fee. Well, then, he says, that
is all right; Blackburn will buy your property for you and you
pay him his fee; well, then, he says, now, that is all right; that
is the bargain. Mr. Cowan said that is all right, that is a bar-
gain. So then we went up to the Court House."

Mrs. Huffnagle corroborated the plaintiff's foregoing testi-
mony. Mr. Hazlett and Mr. Cowan were both dead at the time
of the trial.

At the sale which followed, the lots advertised were sold to
the defendant for $1,142, and the sheriff's deed was duly ac-
knowledged and delivered. Three or four weeks after the sale,
the plaintiff, being sick himself, sent Mrs. Huffnagle to see the
defendant about having the lots re-conveyed to him. Mrs.
Huffnagle testified that she met the defendant at his house, and
after she had made her purpose known to him he said he did
not know what he might do if he were offered the money; that
she then said, that was not the bargain, that he was to take a
judgment; that defendant replied, every one must look out for
himself. On September 18, 1884, when the plaintiff and de-
fendant first met after the day of the sheriff's sale, the plaintiff,
accompanied by an attorney from Pittsburgh and one Heil-
brunner, who had drawn his check for a certain amount, went
to the defendant, then in possession of the lots, and told him
that plaintiff was now ready to repay him the money he had
paid for the lots bought at sheriff's sale, together with his ex-
penses, in accordance with the agreement. To this offer the de-
fendant replied that he was surprised to hear such a statement,
and that it was a fabrication from beginning to end, denying
that such an agreement had ever been made.

The defendant, in his own behalf, testified, in substance, that
no such arrangement as testified to by the plaintiff and his
wife was ever made by him; that the only dealing he had with
the defendant was in regard to a loan to be obtained for the

Charge of Court below.

purpose of paying the Croushore execution, and that after consulting with Mr. Cowan, his attorney, the defendant informed the plaintiff he could do nothing for him; that he bought the property for himself, never thought of anything else, and did not tell Mr. Houseman or any other person that he would buy for the plaintiff; and that he never heard of the claim set up by the plaintiff until several years had passed after the sale. The defendant's testimony was corroborated, to some extent, by that of his wife, his son, W. D. Blackburn, and others. It was also shown that defendant had expended money in valuable improvements upon the property.

At the close of the testimony, the court, HUNTER, P. J., submitted the case to the jury, charging in part as follows:

The trust here set up by the plaintiff is what is known in law as a trust ex maleficio; that is to say, a trust created by the misconduct, or by the wrongful act of the defendant, to the injury of the party complaining. What constitutes this, is not always easily determined, and practically must depend upon the facts as developed in each particular case. I need hardly repeat this. Each particular case must stand by itself, and upon the proof offered and presented in the case; so that the instances of fraud may be as numerous, perhaps, as the cases themselves, and it would be almost impossible to pick out any particular case reported, where there is no dissimilarity in the case from the one on trial, and to say that that case controls this one under consideration.

There are, however, some general rules that apply to all cases where fraud is set up. One of these rules is, that a promise by a purchaser of real estate at a sheriff's sale, who buys with his own money, under a promise that he will convey the purchased premises to another, the defendant in the execution, for example, upon the payment of the purchase money or a certain sum, creates no trust that can be enforced by law. The mere naked promise to convey, followed by the purchase, the purchase money paid by the person making the promise, without more, we say, is not such a contract as the law or equity would enforce.

So then, if you apply this rule to the cases now on trial, it makes no difference what promise Blackburn may have made

Charge of Court below.

before the sale or at any time, to convey the land to Huffnagle; it could not avail the latter here, and standing alone upon such promise, the same in these proceedings, in these actions, is absolutely worthless. It would be different if Blackburn purchased with Huffnagle's money; for in such case the former would only be acting practically as agent, or in trust, for the latter. That is to say, if Blackburn promised to purchase for Huffnagle, and Huffnagle furnished the money, then the arrangement thus made could be enforced and carried out, and the law would compel the purchaser to comply with such contract. But this is not contended for here. In point of fact it is not disputed that Blackburn paid the purchase price out of his own pocket.

Another rule is, that if any fraud was committed by Blackburn it must have been at the time of the sale: in other words, that the title had its birth in fraud; so that any wrong or fraud committed by the defendant, Blackburn, after the sale, standing alone, would be insufficient to entitle the plaintiff to recover here. The fraud, too, must be to the injury of the party setting it up and to the benefit of him committing it; and, in cases like the one which we have now under consideration, there must be an intent to do an injury or wrong at the time the title was procured.

Applying, then, this general doctrine of the law of fraud, I will be permitted to quote the language of the Supreme Court in the case of Abbey v. Dewey, 25 Pa. 416: "We have several times lately decided," says the court, "in obedience to what we are satisfied is the law of Pennsylvania, that a purchaser at a sheriff's sale, who practices any deceit or imposture, or, who is guilty of any trick or device the object of which is to get the property at an undervalue, thereby renders the title so acquired utterly void and worthless in his hands."

In another case which I shall quote from as being the law, the case of Hogg v. Wilkins, 1 Gr. 72, by substituting the names of the parties here for the parties in the case we refer to, the law as enunciated by the Supreme Court would be as follows: That is to say, that Blackburn's title can only be impugned by proof: 1. That he falsely declared his purpose to buy the land for Huffnagle, upon Huffnagle refunding to him the purchase money with interest. 2. That this declaration was made with

Charge of Court below.

a fraudulent design to prevent or diminish competition by persons who might be bidders; and 3. That by this means he got the land at a price less than its value and less than it would have brought at a fair sale. You will then take up the evidence. . . . .

The plaintiff requests the court to charge the jury:

5. This case rests upon a very narrow basis. If the jury find there was such a contract as that alleged by the plaintiff and his witnesses, and also that the defendant was the means of preventing Houseman from becoming the purchaser for the plaintiff, Huffnagle, and if Blackburn, after the day of sale, denied that there was any such contract to purchase upon his part, then, so far as the law is concerned, the jury will, be at liberty to find verdicts for the plaintiff in both cases.

Answer: We affirm this point, referring you, however, more particularly to the instructions we have given you in the general charge.[5]

The defendant requests the court to charge the jury:

1. To establish any trust in favor of the plaintiff in this case, he must show the agreement, the amount to be paid, the time of payment, etc. And, the plaintiff himself having testified that no agreement was made, other than that Blackburn was to buy this property for him and take a judgment, no amount having been fixed, no time of payment agreed upon, no money paid by the plaintiff, the whole matter resting in parol, and vague and uncertain, the verdict of the jury must be for the defendant.

Answer: We decline so to instruct you. It might be that if the arrangement was as contended for by the plaintiff, the amount to be paid by the defendant was not fixed definitely, either as to the amount or the time of payment, and no money paid; yet this would not necessarily prevent a recovery by the plaintiff here.[6]

2. That the time intervening between May 17, 1879, to May 2, 1887, the time at which this action was brought, and during which time the defendant expended large sums of money in repairing and improving the property, was too long; and therefore the plaintiff lost any equity to which he might have been entitled under his alleged arrangement, and cannot now recover.

Answer: Nor can we affirm this proposition. This action

has been brought within a period not prohibited by law; and, as to the equitable rights of the defendant, as to the valuable improvements the defendant may have made and the length of time which the plaintiff allowed to pass, these might be facts, indeed would be facts, reflecting upon what the arrangement was, if any, at the time of the sale, and in answer in part to the fraud set up by the plaintiff, yet not conclusive, as is asserted in the point.[7]

4. That resulting trusts can be created only by the payment of the purchase money by the party claiming to be the cestui que trust, or by fraud at the time of the purchase on the part of the purchaser at sheriff's sale, and both these requirements being wanting in this case, the verdict must be for the defendant.

Answer: The law of resulting or constructive trusts is correctly stated in this proposition; but we decline to say to you that there was in point of fact no fraud, or at least no fraud by operation of law at the time of the purchase. We say to you that there is enough in the evidence to submit the question of fraud to the jury.[9]

5. That the act of April 22, 1856, P. L. 533, requires that all trusts and all agreements concerning real estate shall be in writing, and signed by the parties holding the title therefor; and the plaintiff having failed to prove the existence of any such written agreement, your verdict must be for the defendant.

Answer: This point is refused.[10]

7. That under the law and the evidence, the verdict must be for the defendant; and the jury are so instructed.

Answer: This we refuse.[12]

—The jury returned a verdict in each case in favor of the plaintiff for the land described in the writ. Rules for new trials having been discharged, judgments were entered, when the defendant took these appeals assigning for error, inter alia:

5. The answer to the plaintiff's point.[5]

6–12. The answers to the defendant's points.[6 to 12]


*Mr. E. E. Robbins* (with him *Mr. D. S. Atkinson* and *Mr. J. M. Peoples*), for the appellant.

As to the insufficiency of the evidence to establish the trust, counsel cited: Kistler's App., 73 Pa. 393; Kimmel v. Smith,

Opinion of the Court.

117 Pa. 193; Salsbury v. Black, 119 Pa. 200. As to § 6, act of April 22, 1856, P. L. 533: Duff v. Wilson, 72 Pa. 442; Seylar v. Carson, 69 Pa. 81; Rankin v. Porter, 7 W. 387; Maul v. Rider, 51 Pa. 386; Miller v. Bealer, 100 Pa. 584; Douglass v. Lucas, 63 Pa. 9; Clark v. Trindle, 52 Pa. 492; Best v. Campbell, 62 Pa. 478; McNinch v. Trego, 73 Pa. 52; Christy v. Sill, 95 Pa. 383.

*Mr. H. P. Laird* (with him *Mr. J. B. Keenan*), for the appellee.

OPINION, MR. JUSTICE MITCHELL:

That there were some conversations between the parties in regard to the impending sheriff's sale is unquestionable, but that they amounted to an agreement, the subsequent breach of which, even fortified by the prevention of Houseman from bidding, would constitute a trust ex maleficio, is by no means clear. By plaintiff's own version, the terms were extremely indefinite; and, as the final conversation was in the presence of counsel for both parties, the inference is very strong that it was the failure to agree on some essential point that induced Mr. Cowan to lay down his pen again after having taken it up, as plaintiff says, to put the matter in writing. But plaintiff's version, indefinite as it is, is denied positively by defendant; and, if the weight of the testimony at the trial is with plaintiff, the conduct of the parties, on the other hand, is clearly more consistent with the account given by the defendant. Taken as a whole, the case is very similar to, and in some respects not so strong as Kimmel v. Smith, 117 Pa. 183, and falls short of the measure of proof required in such actions.

There is also another ground fatal to plaintiff's recovery. If he ever had a right of action, he lost it by inexcusable delay. The sale took place in May, 1879, and this suit was not brought until 1887. Plaintiff, by his own testimony and his wife's, had notice within four or five weeks from the sale that defendant refused to abide by the alleged agreement. Why did he wait to bring suit, for eight years, and until the witnesses who could have made the whole matter absolutely clear, Cowan and Hazlett, the counsel in whose presence he says the agreement was made, were both dead? The learned judge below,

though explaining very fully and accurately to the jury the general principles of law, passed this point over with the brief and peremptory direction that the action had been brought within a period not prohibited by law. This instruction was based apparently upon the so-called tender in September, 1884, as the starting-point of the statutory period. But to this there are two conclusive objections. First, it was too late. The plaintiff, as already noted, was informed, not later than June, 1879, that the agreement on which his rights depended was repudiated by defendant, and with this knowledge he let the five years the statute gave him go by before he made any further move. But, secondly, passing over the technical objections to the so-called tender, and treating it as at least a valid demand, it is perfectly clear upon its face that it was not plaintiff's first notice that defendant would claim the property as his own, nor even an effort to find out whether he would still persist in such claim, already made in June, 1879. The whole arrangement, getting the lawyer from Pittsburgh, with Heilbrunner and his check in the back-ground, the formal character of the demand, and the ready acquiescence, without argument or persuasion, in defendant's refusal, indicates that it was an attempt to retrieve ground already lost, and was intended for the formal opening of the contest the plaintiff knew was necessary for the assertion of his claim. Even for this purpose it was too late; and yet he waited three years more before issuing his writ. The act of 1856 was passed to put an end to just such controversies. As said by the present Chief Justice in Christy v. Sill, 95 Pa. 380, 384, " there must be some point of time when a purchaser of real estate at a judicial sale shall not have his title cut up by the roots by mere parol evidence of what took place at such sale, or by a secret trust, disentombed after the lapse of years, and set up by the uncertain recollection of witnesses as to remote transactions. The act of 1856 was intended to prevent titles being disturbed in this manner." The defendant's second point, though not expressed with precision and complicated with irrelevant matters, was intended to claim the benefit of the act of 1856, and was so treated by the learned judge. So understood, both it and the seventh point should have been affirmed.

Judgment reversed.