[No. 7640.   Decided June 4, 1909.]

M. H. CUSHING, *Appellant*, v. MAY N. HEUSTON, *Defendant*, JESSIE M. ELLIOTT *et al.*, *Interveners and Respondents*.[1]

TRUSTS—TRUSTEE EX MALEFICIO — VERBAL PROMISE — EVIDENCE— SUFFICIENCY. A trust *ex maleficio* does not arise from a mere verbal promise by the purchaser of one of several lots to attend to the matter of acquiring the title to abutting tide lands for the benefit of the purchasers of other lots in the same block, made at the same time, where the parties were entire strangers, the promisor had no funds or property in his hands belonging to the others and none was furnished and he did not agree to advance any for the contemplated purchase, and he was not to receive any compensation for the volunteered service, and in acquiring a deed for himself, the grantors of the tide lands were not concerned as to what parties were to be benefited by the purchase; notwithstanding representations that the purchaser was acting for the benefit of himself and neighbors.

APPEAL—REVIEW—FINDINGS. In an equity case tried *de novo* on appeal, the supreme court is not bound by the findings of the trial court.

TRUSTS—IMPLIED TRUSTS—EVIDENCE—SUFFICIENCY. An implied trust upon the holder of a legal title to land should not be found on conflicting parol testimony, if there is left any ground of doubt in regard to it.

Appeal from a judgment of the superior court for King county, Frater, J., entered April 7, 1908, upon findings in favor of the interveners, after a trial on the merits before the court without a jury, in an action for specific performance.   Reversed.

*Larrabee & Wright* and *George C. Congdon*, for appellant.

*Harrison Bostwick*, for interveners and respondents.

PARKER, J.—This is a suit for specific performance, seeking to compel conveyance of certain tide land. The real controversy is between the plaintiff and the interveners, both of whom claim the right to a conveyance from the de-

[1]Reported in 102 Pac. 29.

fendant, who is willing to convey to such persons as the court may direct. The material facts are as follows: On about March 1, 1905, the intervener Jessie M. Elliott, Mrs. Ellen Fish, and Mrs. Vine Burrington became the owners of lots 18, 19, 20, and 21, and the plaintiff became the owner of lots 24 and 25, all in block 2, Chilberg's Addition to West Seattle, all of which lots front upon the tide land involved in this action. The lots were acquired by the respective parties at the same time, by contract with W. W. McGuire, agent of the then owner.

At the time of the lot purchase, some conversation took place between these parties and McGuire, which the trial court construed to be a verbal contract by which the parties were to purchase the tide land in front of their lots at a dollar and a quarter per front foot, and also by which Cushing was to act as the agent of the other parties in looking after and consummating the purchase of the tide lands by and through McGuire, as agent of the defendants B. F. Heuston and wife, the owners of the tide land. The correctness of the finding of the trial court upon this question is challenged by the plaintiff, which we will notice later, and review the evidence upon which it is based. At this time no money was paid upon the proposed tide land purchased by any one, nor was any money furnished Cushing by any one to be paid by him thereon, nor was there any promise by him, or agreement by which he was to advance the money necessary to bind or consummate the proposed tide land purchase, nor was there any agreement to pay him for such service. Cushing did not go to the office of McGuire to consummate the tide land purchase, as it is claimed he agreed to do under the alleged agency contract, but some days thereafter, on March 4, 1905, he went to the owners of the tide land, Heuston and wife, at Tacoma, and purchased directly from them, in his own name, all of the tide land in front of lots 18 to 25, inclusive, paying $50 from his

own funds upon the purchase price, which purchase was
then evidenced by the following writing:

"March 4th, 1905.

"Received of M. H. Cushing, $50 dollars, part payment
for tide lands in front of Lots 18 to 25 inclusive, Block 2,
Chilberg's addition to West Seattle, King County, Washington, this day sold him for $218.75; balance $168.75 payable on or before one year with interest at 6% per annum.
Special warranty deed on full payment.

"(Signed)   B. F. Heuston."

This was executed by Heuston in behalf of himself and
wife, who consented to and ratified it. The court found that
Heuston made this sale with the understanding that Cushing was purchasing the land for the benefit of himself and
his neighbors, Jessie M. Elliott and others, who were the
upland owners. As to the correctness of this finding and
as to what inducements other than the purchase price caused
the Heustons to sell to Cushing, we will notice later. The
interveners, by assignments and conveyances, made before
the commencement of this action, became interested as follows: Gaffner and wife owned lots 18 and 19, Jessie M.
Elliott owned lots 20 and 21, and Hoadley and wife owned
lots 22 and 23, while Cushing, the plaintiff, owned lots 24
and 25, as originally purchased by him. Thereafter, in November, 1905, the interveners tendered to Cushing such portion of the $50 as had been paid by him to the Heustons
upon the tide land claimed by them, which tender was refused. This is the only tender ever made to Cushing.

On March 1, 1906, Cushing tendered to the Heustons the
remaining principal and interest due upon the tide land contract, and demanded a deed in compliance with its terms,
all of which was refused. Thereafter this action was commenced by Cushing, against Heuston and wife, to enforce
specific performance of the contract, and thereafter the interveners filed their complaint in intervention, praying that
deeds be made to them for the tide land in front of their
lots. Thereafter, before trial, the defendant B. F. Heuston

died, when his wife, the defendant, became executrix of his last will and testament. No effort was made at the trial, by Hoadley and wife to establish their claims, which were treated as abandoned. The trial court disposed of the cause by decreeing that the defendant May N. Heuston, individu-ally and as executrix, upon payment to her of the balance of the purchase price, should deed the tide land as follows: To the interveners Gaffner and wife, the tide land in front of their lots 18 and 19; to the intervener Jessie M. Elliott, the tide land in front of her lots 20 and 21, and to the plaintiff Cushing, the tide land in front of his and Hoadley's lots 22, 23, 24, and 25. Thereupon the plaintiff appealed to this court, where he now contends that he is entitled to have all the tide land deeded to him by defendant, upon his pay-ing the balance of the purchase price as agreed in the con-tract of purchase. The decree was rendered in favor of the interveners Elliott and Gaffners as to the tide land in front of their lots, and it is now sought to be supported, upon the theory that the purchase of the tide land by Cush-ing in his own name, in view of his relation to and agreement with the interveners and defendants, raised a constructive trust in favor of the interveners.

In order to correctly apply the doctrine of equity re-lating to such trusts, in the determination of this question, we find it necessary to go beyond the findings of the trial court touching the relations of Jessie M. Elliott and her associates with Cushing, and the inducement which led the Heustons to sell to Cushing, and look into the evidence, to the end that we may see the real relation of the parties to each other more in detail and with greater certainty than is expressed in the findings of the trial court, which are general in their nature, and to the effect that Cushing was acting as agent for the others, and that he induced the Heustons to sell to him by fraudulent representations.

It appears from the evidence that, until the time of the purchase of the lots, about March 1, 1905, Jessie M. Elliott

and her associates had never met the plaintiff Cushing, being then entire strangers to him. Their coming together there resulted evidently in a common desire to purchase lots in the addition, and all being in conversation with Mr. McGuire, the agent, and the purchase of their respective lots being consummated, then occurred all of the conversation which the trial court construed as an agency agreement on the part of Cushing, to purchase the tide land for himself and the other lot owners.

As to this alleged agreement, Jessie M. Elliott was the principal witness, and testified as follows:

"A. Mr. McGuire assured us we could have the tide lands abutting our upland. Q. What was said at that time, if anything, Mrs. Elliott, when you purchased these lands of Mr. McGuire—the uplands—regarding the tide lands? A. Why, Mr. McGuire, Mrs. Burrington and myself were standing there together, and others, and Mr. Cushing at his own proposal—his own suggestion—suggested that he attend to the tide lands for the ladies. There were only three ladies that bought tide lands with him, adjoining him, and we agreed to it, and he was to go to McGuire's office the next morning and secure these tide lands for us instead of our going and bothering about it. Q. You relied upon that? A. We relied upon it assuredly. We fully understood it that he was to purchase these tide lands for us jointly. Q. Did you know at that time what you were to purchase them for? A. Yes, sir; for a dollar and a quarter a front foot. Q. Who offered them for a dollar and a quarter? A. Mr. McGuire offered us. He told us at the time that they could be bought of Mr. Heuston in Tacoma. Q. Why didn't you buy your tide lands of Mr. McGuire? A. Well, simply because Mr. Cushing offered to attend to this for us. We were very glad to have some one attend to it for us, and we all agreed by answering we would be very glad to have him attend to it."

Mr. McGuire, the agent, corroborates Mrs. Elliott in a very general way, giving but few of the details of the conversation touching Cushing's agency. He says:

"They said they wanted the tide land if they took the upland lots, and I assured them they could have the tide lands.

So they finally delegated Mr. Cushing to see me the next morning at ten o'clock at my office and arrange for the purchase of the tide lands. Mrs. Elliott did the talking. After talking to the other ladies, and asking them if it was satisfactory for Mr. Cushing to attend to it for them. . . . They were to buy them on contract, so much down and the balance in a year. . . . Mrs. Elliott says: 'I am very busy, and you go attend to it without all of us being there.' "

Touching this conversation and the alleged agreement, Mr. Cushing, the plaintiff, testifies:

"Q. Was there ever such an agreement entered into, Mr. Cushing? A. None whatever. Q. Now, Mr. Cushing, were you authorized—were you delegated as the agent of Mrs. Fish and Mrs. Burrington and Mrs. Elliott to purchase any tide land lots? A. None whatever, at no time. Q. Was anything said there about you looking after the purchase? A. Nothing whatever. Q. Now, you heard Mr. McGuire's evidence in regard that he told you who was the owner. Did you hear that? A. Yes, I understood him to say he told me, which is not so. I knew nothing about who owned the property at that time. Q. How did you find it out? A. I explained to Dr. Saury that I was to be a neighbor of his over there and that I had bought certain lots. He says, 'Did you get the tide land?' and I says, 'No,' and he says, 'You better get the tide lands, because the meander line is close up to the bank,' and I asked him who owned it, and he says Mr. Heuston of Tacoma, he thought owned that in there. . . . Then I looked up the records and I found out Mr. Heuston owned some tide land in there."

Mrs. Ellen Fish, one of Mrs. Elliott's original associates, touching this alleged agreement for the purchase of the tide land, testified:

"Q. Do you remember if there was any agreement made there between yourself and all the parties that I have mentioned whereby Cushing was appointed your agent? A. No, sir. Q. Was there anything said about the tide lands, the purchase of the tide lands? A. Nothing whatever that I remember. Q. By the way, are you acquainted with Mr. McGuire? A. Yes, sir. Q. Well, did you ever speak to him in any way that you were anxious to secure the tide lands in

front of your lots? A. No, sir, we were not wanting the tide lands; had no idea of getting the tide lands."

Mrs. Vine Burrington, one of Mrs. Elliott's original associates, touching this same matter, testified as follows:

"Q. Was there anything said at all about securing the tide lands? A. Not that I know of; not to my knowledge. Q. Did you ever attempt to secure the tide lands there? A. No, sir, I never did. Q. Did you want the tide lands? A. No, I didn't want them. Q. Did you ever offer any price for the tide lands? A. I never did."

Touching the matter of the inducements, if any, other than the money consideration, which led the defendants Heuston and wife to sell the tide lands to Cushing, we have the testimony of Mrs. Heuston as to the conversation which took place between Cushing and her husband at the time, she being present, as follows:

"Mr. Cushing said that he and some neighbors had bought some upland adjoining the tide land, which they understood Mr. Heuston owned, and he had come over to see what he could do to purchase said tide land for himself and his neighbors."

This conversation evidently occurred on March 4, 1905, the date of the purchase. We find no competent evidence in the record showing any other or different representations made by Cushing to the Heustons, nor is there any competent evidence in the record indicating that such representation, as to whom Cushing was purchasing for, induced the Heustons to make the sale.

Passing for the present the matter of conflict of testimony, and viewing the relationship of the parties in the most favorable light for the interveners as testified to by Mrs. Elliott, it at once becomes plain that whatever trust arose in favor of the interveners upon the purchase of the tide lands by Cushing, it falls within that class of constructive trusts designated "trusts *ex maleficio*," for in this case the alleged trust was not evidenced by any writing, nor was any money

or property of the persons claiming to be beneficiaries used by Cushing in the purchase of the tide lands, nor did he agree to loan or advance funds therefor. The trust must be constructed, if at all, from the relationship of the parties and the manner of acquiring the tide land from the Heustons. And, unless we can find some element of fraud or bad faith on the part of Cushing, by which he violated some duty recognized in law or equity, as owing to Mrs. Elliott and her associates and to the Heustons, no trust was created. In 3 Pomeroy's Eq. Jur. (3d ed.), § 1056, it is stated:

"In order that the doctrine of trusts *ex maleficio* with respect to land may be enforced under any circumstances, there must be something more than a mere verbal promise, however unequivocal, otherwise the statute of frauds would be virtually abrogated; there must be an element of positive fraud accompanying the promise, and by means of which the acquisition of the legal title is wrongfully consummated. Equity does not pretend to enforce verbal promises in the face of the statute."

Along the same lines, in 1 Perry on Trusts (5th ed.), § 134, it is stated:

"A trust results from the acts, and not from the agreements, of the parties, or rather from the acts accompanied by the agreements; but no trust can be set up by mere parol agreements, or, as has been said, no trust results merely from the breach of a parol contract; as if one agrees to purchase land and give another an interest in it, and he purchases and pays his own money, and takes the title in his own name, no trust can result."

Beach on Trusts & Trustees, vol. 1, § 219, is to the same effect. With these general principles before us, we are to inquire what legal or equitable duty of Cushing, owing to the interveners or defendants, was violated by him. We have seen he was an entire stranger to the parties. He was not bound by any writing. No duty was imposed upon him by having any funds or property in his hands belonging to the interveners; nor did he agree to advance or loan money for

the tide land purchase; nor was it contemplated that he was to have any compensation from the interveners for his services. The testimony of the intervener Jessie M. Elliott leaves no doubt as to these matters. In the light of these facts, it is difficult indeed to conceive of any duty resting upon him which can be recognized in law or equity as being violated by the course he took. If it be suggested that, by Cushing's promise as interpreted by Mrs. Elliott, the interveners were induced to let the purchase of the tide land rest with him, when they otherwise might have purchased it directly themselves, the answer is found in the fact (taking Mrs. Elliott's version), that she and her associates furnished no money or means for consummating the purchase; that McGuire then present was agent for the sale of the tide lands, as well as the lots, and she and her associates could have dealt directly with him had they so desired; that he told them who the owner of the tide land was, and that whatever service Cushing agreed to render was to be voluntary and without consideration. We do not think this was such an agreement, though it be all that Mrs. Elliott claims, as in law or equity obligated Cushing to do anything.

In discussing a case where the facts were such that it might be argued the persons claiming to be beneficiaries were prevented from purchasing, by the promise of their supposed agent, the Court of Appeals of New York, in *Wheeler v. Reynolds,* 66 N. Y. 227, 234, said:

"There was as much ground for saying there as here that the plaintiff relied upon the agreement, so far that he did not himself bid or make arrangements with other parties for bidding, and yet it was held that it was not a case for the enforcement of the agreement either upon the ground of part performance or of a parol trust repudiated by the trustee in wrong of the plaintiff. If one employs another by parol to buy land for him with his own money, and the latter buys the land and takes the deed to himself and refuses the former any right therein, the former cannot compel a conveyance to him, even by showing that but for his reliance

upon the fidelity of his agent he would have purchased in person or through some other agent."

In the case of *Lehman v. Lewis*, 62 Ala. 129, 133, discussing a similar situation and quoting approvingly from one of its earlier decisions, the rule is stated in this language:

"Where a man employs another person by parol, as an agent, to buy an estate for him, and the latter buys it accordingly in his own name, and no part of the purchase-money is paid by the principal, then, if the agent denies the trust, and there is no written agreement or document establishing it, he cannot, by a suit in equity, compel the agent to convey the estate to him; for (as has been said) that would be decidedly in the teeth of the statute of frauds."

These views are in harmony with the following authorities, to which many might be added: 15 Am. & Eng. Ency. Law (2d ed.), 1187; *Pinnock v. Clough*, 16 Vt. 500, 42 Am. Dec. 521; *Hunt v. Roberts*, 40 Me. 187; *Bland v. Talley*, 50 Ark. 71, 6 S. W. 234; *Appeal of McCall* (Pa.), 11 Atl. 206; *Kraft v. Smith*, 117 Pa. St. 183, 11 Atl. 370; *Morton v. Nelson* (Ill.), 31 N. E. 168; *Bailey v. Hemenway*, 147 Mass. 326, 17 N. E. 645; *Hoffman v. Bloomsburg etc. R. Co.*, 143 Pa. St. 503, 22 Atl. 823; *Taylor v. Kelley*, 103 Cal. 178, 37 Pac. 216.

The principal authority cited by counsel for interveners, and probably the strongest case to be found in support of their contention that the trust arose by virtue of Cushing's alleged agency, is that of *Rose v. Hayden*, 35 Kan. 106, 10 Pac. 554, 57 Am. Rep. 145. If that decision be regarded applicable to the facts of this case, then we think it must also be regarded as opposed to the great weight of authority in this country. There were, however, in that case circumstances which rendered it distinguishable from this. In that case the agents were employed to negotiate for the purchase of certain property, the asking price of which was unknown. They were general real estate agents, engaged in the business. They were to be paid for their services, as they

had previously been employed and paid by their principal to purchase other property for him. While this relation existed with their principal, they purchased the property with their own funds and took title in themselves, which the court held was in trust for their principal.

In view of the willingness of Mrs. Heuston, the defendant, to convey this tide land to whichever of the parties the court finds entitled thereto, it seems of little consequence as to what representations were made by Cushing at the time he purchased the same from the Heustons. But in any event, were there fraudulent representations made to the Heustons which induced them to sell to Cushing, or were they moved so to do by the purchase price alone? In this connection we regard the vital question to be, not the representations which Cushing made as to his purpose in purchasing, but how were the Heustons influenced thereby. Would they have refused to sell in the absence of such representations? We find no competent evidence in the record that Cushing informed the Heustons of the names of any of his neighbors for whom it is claimed he was purchasing; nor do we find any competent evidence in the record showing that it was of any consequence to the Heustons as to whom Cushing was purchasing for; and the fact that the written evidence of the purchase was then made by the Heustons in Cushing's name negatives any such concern on their part. No representations, whatever their nature, can work fraud or deceit upon a party when they relate to a matter which does not concern him, and when he is not moved to act thereby. We cannot presume that the Heustons were induced to sell the tide land to Cushing by any other consideration than the purchase price named in the written evidence of sale; and since it does not affirmatively appear that the representations were the inducements for the Heustons making the sale, Cushing did not thereby become a trustee *ex maleficio. Dilts v. Stewart* (Pa.), 1 Atl. 587; 3 Pomeroy's Eq. Jur. (3d ed.), § 1056. The case of *Kelly v. Central Pac. R. Co.*, 74 Cal. 557, 16 Pac. 386, 5 Am. St.

470, cited by counsel for interveners, is not in point, for as pointed out by the court in that case, the false and fraudulent representations were the inducing cause of the contract.

So far, it will be observed, our discussion of the relative rights of the parties has been upon the assumption that there was an understanding between Cushing and the other lot owners by which he was to purchase the tide land for them, such as was testified to by Mrs. Elliott. Turning now to the question of fact as to whether or not any such understanding or agreement ever existed, we find ourselves, in the light of the evidence above quoted (which is substantially all there was upon that question), unable to arrive at the ultimate facts, as found by the learned trial court, with that degree of certainty required by well settled rules of equity in order to construct a trust *ex maleficio* out of the acts of the parties. We are not unmindful of the general rule that appellate courts are slow to disturb findings made by juries and trial courts on questions of fact; but this is a pure suit in equity, brought to this court with all of the evidence and findings thereon made by the trial court, with exceptions to such findings. Hence, it falls within that class of cases which we are required to examine *de novo*. Bal. Code, § 6520 (P. C. § 1068). Referring to the force and effect of findings made by the lower court, this court said, in *In re Garfinkle*, 37 Wash. 650, 654, 80 Pac. 188:

"The same rule does not obtain in passing upon the findings of the court as does upon the verdict of a jury. In the latter case the court is bound by the verdict of a jury on questions of fact, while in the former, though the findings of the court are more or less advisory, . . . yet such findings are not conclusive on the appellate court, which will look at the testimony to see if the findings are justified."

See, also, *Roberts v. Washington Nat. Bank*, 11 Wash. 550, 40 Pac. 225; *Cleveland v. Glover*, 13 Wash 131, 42 Pac. 538; *Allen v. Swerdfiger*, 14 Wash. 461, 44 Pac. 894.

The claims of the interveners here must be substantiated by

something more than a mere preponderance of the evidence. As stated in 1 Beach on Trusts and Trustees, § 112:

"The rule is well established that, in order to impress an implied trust upon the holder of a legal title to real estate by parol testimony, it must be of such a character as to leave the court without any ground for doubt in regard to it. Where this characteristic is absent or the agreement comes within the provisions of the statute of frauds, it will be held unenforcible and void."

Tested by this rule, we think the evidence does not warrant the holding of the learned trial court that Cushing acquired the interest in the tide lands by his contract of purchase from the Heustons, in trust for the interveners.

We conclude that the decree of the superior court should be reversed, in so far as it directs deeds to be made by defendant May N. Heuston, as executrix and individually, to the interveners Jessie M. Elliott and Charles H. Gaffner, for the tide land in front of their lots 19, 20, 21, and 22; and that the plaintiff M. H. Cushing is entitled to a decree of specific performance in this action requiring the defendant as executrix and individually to deed to him said tide lands, in compliance with the contract of purchase therefor, made March 4, 1905, upon his paying the balance of the purchase price with interest to the date of his tender on March 1, 1906. It is so ordered, and the superior court is directed to enter a decree accordingly.

The plaintiff and appellant will recover in this court his taxable costs upon this appeal, against the interveners and respondents Jessie M. Elliott and Charles F. Gaffner and Reba Gaffner, his wife, since the controversy here has been between no other parties.

FULLERTON, CROW, MOUNT, DUNBAR, MORRIS, and GOSE, JJ., concur.