[No. 28517.   Department Two.   June 5, 1942.]

COLUMBIA LUMBER COMPANY, *Appellant,* v. C. W. BUSH
*et al., Respondents.*[1]

[1]Reported in 126 P. (2d) 584.

658

*Lundin & Barto,* for appellant.

*Colvin, Rhodes & Franklin,* for respondents.

SIMPSON, J.—Plaintiff instituted this action to foreclose a materialman's lien on defendants' property in Seattle, King county, Washington. The complaint alleged that, at the oral request of defendant C. W. Bush, plaintiff furnished from March 20, 1939, to December 4, 1939, building materials to be used in the construction of a dwelling and garage; that the agreed value of the materials was $1,909.26, of which $320.41 had been paid, leaving due and owing a balance of $1,588.85; and that plaintiff filed its lien February 14, 1940.

In their answer and cross-complaint, defendants denied both the existence of a lien and an indebtedness in excess of $434. Defendants then alleged that plaintiff was engaged in a general contracting business of building houses; that December, 1939, plaintiff orally contracted with defendant Bush to construct a house and garage for $3,707; that it was agreed defendants would be credited with any sums saved in the purchase of materials, which amounted to $241.35; that defendants' indebtedness to plaintiff on the account was $175.69; and that the construction was to be financed by a loan from the Seattle-First National Bank and guaranteed by the FHA. Defendants then alleged that their house was defectively constructed to their damage of $650. Plaintiff in its reply denied the affirmative defense.

After the action was commenced, $434 was credited to defendants by reason of a payment by the bank,

leaving $1,154.85 due for materials furnished. A trial before the court resulted in a judgment dismissing plaintiff's complaint and awarding defendants three hundred dollars in damages and $45.61 as a credit on the account. Plaintiff has appealed.

The assignments of error are (1) in finding that appellant was a contractor; (2) in the admission of parol evidence to vary the terms of written contracts; (3) in admitting in evidence a newspaper advertisement; and (4) in refusing to foreclose appellant's lien.

For convenience defendant C. W. Bush will be referred to as respondent.

The salient facts may be stated as follows: Mr. and Mrs. Bush were the owners of a lot in Seattle upon which they desired to build a home. During the latter portion of 1938, they contacted John Barker, a builder, relative to the proposed dwelling. Thereafter, Barker prepared a plan and an estimate.

In the early part of January, 1939, respondent visited the office of appellant, a retail lumber company, to secure advice and assistance in the construction of his house. Respondent showed the plan which Barker drew to V. G. Impett, at that time an employee of appellant, and stated that Barker had also prepared a building cost estimate. Respondent then informed Impett that the construction would have to be financed by a loan. Impett assured him that a loan could be obtained from the Seattle-First National Bank under the FHA financing program. About three days later Barker called on Impett. After a discussion, a construction figure of $3,707 was decided upon. Thereafter, Impett prepared on a stock form an instrument containing definite and detailed specifications and a construction contract. The contract was attached to the specifications and read as follows:

"Contract

Seattle 1/31/39

"The undersigned contractor agrees to furnish all labor and material necessary to make the above improvements on property located at West 60′ of Lot 28 less So. 120′ For: C. Bush

Price & Terms:

"The owner shall pay the contractor for the performance of the contract in current funds, the sum of $3,707.00, said amount to be paid in the following manner: 85% of one-third after one-third of the job has been completed and the Federal Housing Administration has made and approved its first inspection; 85% of one-third after two-thirds of the job has been completed and the Federal Housing Administration has made and approved its second inspection, and the balance thirty days after completion of the building and upon written approval and acceptance by the owner, and final inspection and approval by the Federal Housing Administration and upon satisfactory evidence of all lien waivers."

The contract dated January 31, 1939, was taken from appellant's office by respondent and was thereafter signed by him and his wife as owners and John Barker and Will Robinson as contractors. No contractor's bond was required. The contractors were unknown to appellant prior to the time Barker visited the office during the first part of January, 1939.

In order to obtain a loan, respondent, February 10, 1939, sent to the Seattle-First National Bank a written instrument entitled "Application for Bank Loan." The application stated that, if the loan was granted, the bank was authorized and directed to pay the net proceeds to appellant at its request as construction progressed. Thereafter, the loan was approved and, in turn, the bank applied to the Federal Housing Administration for mortgagee insurance. A part of the

bank's application to the FHA contained a "Mortgagors' Statement" which was signed by respondents. In that statement, they stated that their contractors were John Barker and Will Robinson.

Appellant commenced furnishing building materials March 20th and Barker and Robinson started construction March 22, 1939. Several weeks thereafter they ceased work. A conference, called by their attorney, was attended by respondent, the contractors, and representatives of appellant corporation. Thereafter, a new contract, entered into May 5, 1939, provided:

"CONTRACT

Seattle Wn. 5-5-39

"The undersigned contractor agrees to furnish all labor and material necessary to make the following improvements on property located at 537 No. 70th St. for C. W. Bush.

GENERAL OUTLINE OF WORK TO BE DONE and SPECIFICATIONS:

All carpenter labor in connection with the construction of the house and garage at the above address. This work includes all the following work. All form work for concrete. All framing. All shingling. All Outside finish and trim. All Inside finish and trim including the building up of all cabinet work. All Floor laying—This does not include sheetrock. After all payments have been made on this contract of $665.00 the undersigned release all lien rights against property. While this contract is dated as above all work done and payments made previously to this date is included in this contract agreement. The contractors are to pay their own industrial insurance for labor on this contract.

"PRICE: All of the above for a cash price of Six hundred sixty five DOLLARS ($665.00)

"TERMS: In progress payment of not more than 75%

outstanding as job progresses. Final payment 30 days after acceptance by F.H.A.

"ACCEPTED:

| Frank Peterson | |
|---|---|
| (OWNER) | (CONTRACTOR) |
| C. W. Bush | Will Robinson |
| (OWNER) | (CONTRACTOR) |
| | John Barker |
| (ADDRESS OF OWNER) | (ADDRESS OF CONTRACTOR)" |

A week later the new contractors definitely abandoned the job.

Respondent asked Impett to hire W. R. Oliver to complete the carpenter work and Impett thereupon employed Mr. Oliver. Because of a delay, Oliver refused to work on the job. Impett then, at the request of respondent, secured H. W. Scott, who signed a contract June 16, 1939, which provided that the contractor would furnish all labor and materials necessary to make the following improvements on respondents' property:

"All carpenter work to complete inside finish of house except hardwood floor laying. Also includes the building of 12 x 20 one car garage single constructed ex rear of lot."

During the period of construction after Barker, Robinson, and Peterson had quit, both respondent and Impett procured various individuals to complete the work on the building.

September 27, 1939, the bank received the FHA's inspection report which stated: "Basement to be waterproofed so that it will remain dry." As a result of the basement condition, the FHA refused to grant mortgage insurance. The soil comprising respondents' property was very moist and to a large extent made up of quick sand. In fact, the excavation was undertaken three different times before it was finally com-

pleted. The specifications for the basement wall called for an eight inch thickness. Instead, because of appellant's orders to the cement contractor, a six inch wall was built. Throughout the construction as well as at the time of the trial, water continued to seep into the basement.

Upon respondents' failure to pay the amount claimed by appellant to be due and owing, appellant filed a materialman's lien February 14, 1940, and thereafter commenced this action.

Appellant maintains that the oral contract with respondents required a furnishing of materials only; that the legal relationship between it and respondent was supplier and purchaser of building materials; that respondents' written construction contract with Barker and Robinson precluded the introduction of parol evidence to establish a different relationship; that, since it is not a general contractor, liability does not attach for construction defects; and that the court erred in denying foreclosure of the materialman's lien.

Respondents, on the contrary, contend that, in addition to furnishing materials, the oral contract provided that appellant agreed to build a house and garage to pass FHA inspection for the sum of $3,707, and to permit respondents to secure materials and make contracts with others if a saving could be had; that the oral construction contract created the legal relationship of general contractor and owner; that appellant breached the contract in failing to construct the house in a workmanlike manner and to have it pass FHA inspection; that their written construction contract was not a binding obligation since it was executed only to induce the bank and the FHA to grant a loan; that this purpose was agreed to by both the contractors and appellant; and that appellant was not en-

titled to a lien because of a failure to file its claim within the statutory time.

The facts and contentions resolve themselves into two principal questions: (1) the legal relationship between appellant and respondents, and (2) the foreclosure of appellant's materialman's lien. In considering these questions, we will assume without deciding that the parol evidence and the newspaper advertisement were properly admitted.

The two questions for our determination are primarily ones of fact. Unfortunately, the evidence introduced is in sharp conflict. This evidential conflict, however, was resolved by the trial court in favor of respondents. Besides the decree, findings of fact were made in accordance with respondents' version.

In addition to the findings, the record also contains a statement of facts. Because an independent examination of the evidence must be made, we are met at the outset with the problem of what effect in an equity case should this court attach to the trial court's findings when the record includes the statement of facts. Thus, we preface our discussion of the questions involved with some rules which must be employed by this court when confronted with both findings and a statement of facts in an equity case.

In an equity case tried *de novo* on appeal, the findings of fact, although entitled to great weight and consideration, are not binding on the supreme court. *Roberts v. Washington Nat. Bank,* 11 Wash. 550, 40 Pac. 225; *Allen v. Swerdfiger,* 14 Wash. 461, 44 Pac. 894; *Cushing v. Heuston,* 53 Wash. 379, 102 Pac. 29; *Pacific Lbr. & Timber Co. v. Dailey,* 60 Wash. 566, 111 Pac. 869; *Bunger v. Pruitt,* 73 Wash. 569, 132 Pac. 237; *Allen v. Migliavacca Realty Co.,* 74 Wash. 347, 133 Pac. 580; *Johns v. Arizona Fire Ins. Co.,* 76 Wash.

349, 136 Pac. 120, 49 L. R. A. (N. S.) 101; *Baker v. Yakima Valley Canal Co.,* 77 Wash. 70, 137 Pac. 342; *Williamson Inv. Co. v. Williamson,* 96 Wash. 529, 165 Pac. 385; *Chehalis Coal Co. v. Laisure,* 97 Wash. 422, 166 Pac. 1158; *Rubens v. Rubens,* 101 Wash. 675, 172 Pac. 831.

The supreme court, moreover, has an independent duty devolved on it by law to examine the evidence and determine what findings should have been made. *Pacific Lbr. & Timber Co. v. Dailey, supra; Bunger v. Pruitt, supra; Allen v. Migliavacca Realty Co., supra; Rubens v. Rubens, supra.*

In the situation, however, where the evidence is conflicting or appears to be evenly balanced, the findings of the trial court will not usually be disturbed. *Helphrey v. Strobach,* 13 Wash. 128, 42 Pac. 537; *Skeel v. Christenson,* 17 Wash. 649, 50 Pac. 466; *Golden v. Bullion Mining Co.,* 18 Wash. 183, 51 Pac. 361; *Ford v. Jones,* 22 Wash. 111, 60 Pac. 48; *Cullen v. Whitham,* 33 Wash. 366, 74 Pac. 581; *Chantler v. Hubbell,* 34 Wash. 211, 75 Pac. 802; *Law v. Seeley,* 37 Wash. 166, 79 Pac. 606; *Eno v. Sanders,* 39 Wash. 238, 81 Pac. 696; *Brill v. Hayford,* 41 Wash. 468, 83 Pac. 1119; *Rowland v. Eskelund,* 49 Wash. 679, 96 Pac. 426; *Johns v. Arizona Fire Ins. Co., supra; Bradley v. Donovan-Pattison Realty Co.,* 84 Wash. 654, 147 Pac. 421; *Buff v. Davies,* 100 Wash. 343, 170 Pac. 875; *Osten v. Curtis,* 133 Wash. 360, 233 Pac. 643; *Petro Paint Mfg. Co. v. Taylor,* 147 Wash. 158, 265 Pac. 155; *Wallis v. Elliott,* 154 Wash. 625, 282 Pac. 928; *Carr v. Hamlin,* 171 Wash. 120, 18 P. (2d) 17; *Reagh v. Dickey,* 183 Wash. 564, 48 P. (2d) 941; *Income Investors, Inc. v. Shelton,* 3 Wn. (2d) 599, 101 P. (2d) 973.

The reason for this last rule is succinctly stated in *Bradley v. Donovan-Pattison Realty Co., supra:*

"The findings of the trial court, who personally saw the witnesses, heard them testify, observed their conduct and demeanor while testifying, and weighed their interest and motives and the probabilities of the truthfulness of their testimony, will not be disturbed on appeal where this court is not able to say that such findings are clearly not supported by the weight of the evidence."

On the other hand, if this court, after a careful perusal of the statement of facts, is convinced that the findings of fact are not supported by a fair preponderance of the evidence, then they will be disregarded. *Roberts v. Washington Nat. Bank, supra; Allen v. Swerdfiger, supra; Pacific Lbr. & Timber Co. v. Daily, supra; Bunger v. Pruitt, supra; Allen v. Migliavacca Realty Co., supra; Johns v. Arizona Fire Ins. Co., supra; Baker v. Yakima Valley Canal Co., supra; Petro Paint Mfg. Co. v. Taylor, supra; Wallis v. Elliott, supra.*

The rule may be restated as follows: Findings of fact are not required in equity cases, but if they are made by the trial court they will be considered and given great weight if the statement of facts is included in the record before us.

Equity cases are tried *de novo* in this court. In so considering the case, it is our duty to make an independent examination of all of the evidence and all of the circumstances surrounding the various parties to the action as disclosed by the statement of facts, and from that examination decide what findings should have been made.

If the determination of the cause depends upon testimony which is in serious conflict, or upon evenly balanced evidence, this court will not disturb the findings of the trial court unless other factors are present which compel us to reach a contrary conclusion. However, if this court ascertains from the entire record

that the findings are not supported by a fair preponderance of the evidence, they will be disregarded.

In reference to the transaction, respondent testified that Impett told him that the company would build the house for $3,707, that it would meet the inspection of the FHA, that appellant could not be named as contractor because to do so would "get in Dutch with the contractors with whom they were doing business"; that "it was against their articles of incorporation"; and that

" . . . after the loan went through Mr. Impett would see that the two fellows were released from it and they would proceed with the carpenter work of the house as outlined in the contract, that is the carpenter work only."

Contractor Robinson testified that Impett told him that the signing of the contract was only a formal matter to enable appellant to procure the loan to construct the building.

While respondents' evidence is persuasive, yet after a study of the entire record we are unable to conclude that appellant undertook to act as a general contractor.

Respondent went to the office of appellant with a prepared plan, some specifications, and a suggested cost price. He was told that appellant company was in the business of selling materials and, in order to accomplish that purpose, its agents would supervise the work of the contractor. Respondent selected his own builders, who were unknown to appellant. The contract was signed by the contractors and respondents at the home of one of the contractors and in the absence of anyone representing appellant company. During the time the house was under construction, respondent, by frequent visits, knew what was being done. After Barker and Robinson quit, respondent

was present at the conference in their attorney's office and thereafter signed the contract of May 5, 1939. Respondents, moreover, do not contend that this contract was only a matter of form. Had respondent understood at that time that appellant was the contractor he would not have been interested in the troubles of Barker and Robinson, nor would he have signed the second contract.

It is further apparent that the reason for naming a contractor May 5, 1939, was no longer of any consequence for the reason that the money to complete the building was available. The loan had been made by the bank and the house was ready for lath.

When Barker, Peterson, and Robinson quit, Mr. Barker asked respondent for a release of the contract of May 5, 1939. Respondent, after calling appellant's office, gave it to him; and, in turn, secured a waiver of lien for work done.

February 10, 1939, respondent made application for an FHA loan and, as has been stated, named John Barker and Will Robinson as contractors. Just above the place where respondent signed the contract there was included within black lines the following:

### "Warning

"Sec. 512.   (a)   National Housing Act.   Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Federal Housing Administration for insurance, or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by the said Administration, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of the said Administration under this Act, makes, passes, utters, or publishes, or causes to be made, passed, uttered, or published any statement, knowing

the same to be false, or alters, forges, or counterfeits, or causes or procures to be altered, forged, or counterfeited, any instrument, paper, or document, or utters, publishes, or passes as true, or causes to be uttered, published, or passed as true, any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset, or income, shall be punished by a fine of not more than $3,000 or by imprisonment for not more than 2 years, or both."

It does not seem possible that respondents would have made a false statement concerning the names of the contractors in the face of this warning.

After Barker, Robinson, and Peterson ceased work respondent interested himself in securing other contractors to complete the house. He secured a bricklayer, a carpenter, an electrician, a plasterer, and a painter, the latter being his uncle. Then, too, although he contends that the contract price was $3,707, the evidence adduced by both parties proves that respondent was highly concerned with the cost of the construction charges to be made by the various contractors.

The preceding instances compel us to disregard the findings of the trial court, and, instead, hold that appellant was merely supervising the details in the construction of the house. All of his actions were out of harmony with his contention that appellant was to complete the building, but were entirely consistent with the contention of appellant that it would supervise the erection of the building.

Respondent makes much of the contents of a newspaper advertisement, the pertinent portion of which reads:

"Are YOU paying RENT FOR A DOOR KEY?
"Don't do it any longer! We'll tell you to the penny just how much you need have to build the home you

need! And just how easy the balance can be taken care of on terms—just like rent. Then, some day it will be yours. Start figuring with us today.

"WE ACCEPT THE FULL RESPONSIBILITY!

"We'll take your ideas and put them into the finished home that will be yours, all ready to move in. We are responsible to you for the completion of your new home by the contractor selected."

We are unable to find anything in the article which is helpful to respondent. It does, however, show the business policy pursued by appellant as testified to by Floyd B. Volk, its general manager and treasurer, in the following language:

"Our business, as you state, is the sale of building materials, and in order to sell those building materials we will assist the customer in getting a loan in order to buy them. That is a service that we render. And we will help further, we will go ahead and help him get a contractor, help him in any steps to put the thing together. He may have figured out how much the thing will amount to. We will help him get a loan on it, we will cooperate with the bank that gives him the loan to see things are going smoothly. Yes, we render the assistance in general as help to the customer, but we don't take over his jobs or anything like that, if that is what you are referring to. . . .

"The banks have and hold the money and take a first mortgage and take it to the Federal Housing Administration and the bank has to get the house completed and generally require that any contractor that takes a job must go under bond. Now when they turn all the money over to us on that and order us to pay it out, which they want us to do because we are more familiar with it than they are, we have the choice of putting the contractor under bond in order to see that he completes these jobs, or if we know him well enough we can guarantee to the people, if we are recommending a contractor, that he is all right and will finish the house. If he is not known to us, we put him under bond. That is the reason why Mr. Phillips in the bank, or anyone, can guarantee the

completion of a house when the bonding company guarantees it to him. That is the way we enter into it, in other words, we are guaranteeing this general contractor will do his job, and really the bonding company does it, if he is our contractor."

If the conflicting evidence stood alone, we would be inclined to approve the findings of the trial court, but, when it is considered and weighed in connection with the circumstances surrounding the activities of all of the parties, we conclude that the findings are not supported by a fair preponderance of the evidence. As we view the entire record in this case, it is clearly apparent that appellant did not contract to build a house for respondents but only agreed to assist them in their building program.

Respondents encountered many obstacles in the building of their home aside from the trouble arising from the nature of the ground upon which the dwelling was erected. The contractors refused to continue work as agreed in their contracts, and there was no way in which they could be compelled to proceed for the reason that no bond had been required. It is quite apparent that they were not personally responsible. In this respect, appellant was to blame since it failed to see to it that the contractors furnished bonds and completed the work as provided for in the written agreements. However, appellant cannot be held liable for the reason that it has not been sued upon its guaranty, and for the further reason that the agreement to be responsible for the completion of the home by the contractors was not in writing.

The final question is whether the lien was timely filed. The trial court found:

"That the evidence fails to show any material furnished or labor performed on said premises within 90 days prior to the filing of said notice of lien."

The lien notice was filed for record February 14, 1940. A witness for appellant testified that deliveries of materials consisting of sewer pipe, cement, and "anti hydro" were made on November 16th, 17th, and December 4th, 1939. The evidence of appellant's witness, Mr. Impett, was very indefinite concerning the delivery and the fact that the materials were used in the construction of the building. Although he had personal supervision of most of the work done on the house, he did not testify concerning the manner in which the materials last delivered were used, but contented himself by saying that they were used in the construction of respondents' home.

His evidence was contradicted by the testimony of respondents, who stated that they moved into their home in August, 1939, and that no work was done after September of that year. They were positive that the items claimed to have been delivered in November and December were not furnished.

The testimony concerning the circumstances surrounding the claimed deliveries fails to indicate that either appellant's or respondents' witnesses testified correctly. The testimony being in that condition, we are unable to hold that the evidence preponderates against the holding of the trial court, and for that reason we must hold that the lien notice was not filed within the period provided by statute.

However, appellant is entitled to a personal judgment against respondents. *Spaulding v. Burke*, 33 Wash. 679, 74 Pac. 829; *Pacific Iron & Steel Works v. Goerig*, 55 Wash. 149, 104 Pac. 151; *Hallett v. Phillips*, 73 Wash. 457, 132 Pac. 51; *Gray v. Hickey*, 94 Wash. 370, 162 Pac. 564; *Pioneer Sand & Gravel Co. v. Hedlund*, 178 Wash. 273, 34 P. (2d) 878.

The items claimed to have been delivered in November and December, 1939, amounted to $6.59. That

amount must necessarily be subtracted from the $1,154.85 owing to appellant. The judgment against respondents should be in the sum of $1,148.26.

The judgment will be modified in accordance with this opinion.

ROBINSON, C. J., BLAKE, and JEFFERS, JJ., concur.

BEALS, J. (concurring)—I am in entire accord with the foregoing opinion, save that it is my view that in certain cases findings of fact made by the trial court in an equity case may be considered for some purposes, even though the record contains no statement of facts.

