[No. 29033. Department One. September 2, 1943.]

IDA WIDMAN et al., *Respondents*, v. LIZA MAURER et al., *Appellants*.[1]

[1]Reported in 141 P. (2d) 135.

*McCarthy, Royce, Hurley & Roberts* and *Thomas A. E. Lally,* for appellants.

*Brown & Brown* and *E. D. Weller,* for respondents.

STEINERT, J.—This was an action to compel the executor of a decedent's estate specifically to perform an alleged oral contract of the decedent obligating her to devise and bequeath her entire estate equally among her ten surviving children. Upon a trial before the court, without a jury, findings were made, conclusions were drawn, and a decree was entered directing the executor to disregard certain provisions contained in the last will and testament of the decedent and to distribute her estate among her children, share and share alike, as prayed for in the complaint. The defendants, including the executor, appealed.

The plaintiff-respondents are Ida Widman, Alice Blank, William Hofmann, Martha Kernkamp, R. J. Hofmann, and Hulda Feldman. The defendant-appellants are Liza Maurer, Frank Hofmann, Christ Hofmann, and F. J. (Fred) Hofmann, who is the executor of the decedent's estate. The respondents and the appellants are all brothers and sisters, and are the surviving children of the decedent, Rosina Hofmann, and her husband, Rudolph Hofmann, who predeceased his wife by many years.

Rudolph Hofmann, the father, died intestate on January 29, 1924, leaving surviving him his widow, Rosina Hofmann, and the ten children above named, all of whom were considerably over twenty-one years of age at the time of their father's death. Fred J. Hofmann is the oldest of the children and Christ Hofmann is the youngest.

Rudolph Hofmann's estate, though not now the immediate subject of this litigation, enters into the controversy by reason of the fact that the proceeds thereof became the property, and constituted a portion of the estate, of Rosina Hofmann, whose will is directly affected by this lawsuit.

The estate left by Rudolph Hofmann consisted of his com-

munity interest in real property appraised at $44,500 and personal property appraised at $31,221.93, or a total of $75,721.93. The liabilities of the estate, consisting of community obligations, amounted to $20,397.51. The net value of the community estate after deducting the liabilities thus amounted to $55,324.42, one-half of which made up the estate of Rudolph Hofmann.

The real property referred to above consisted of several farms and certain residence property in the town of Rosalia. The present action involves solely one of these farms, comprising four hundred sixty-two acres located in Whitman county and referred to in the record as "the home place." As appears by the inventory and appraisement filed in the estate of Rudolph Hofmann on May 5, 1924, this farm was appraised at $25,400.

Included in the personal property listed in that estate were two promissory notes, each in the sum of six thousand dollars, executed respectively by two of Rudolph Hofmann's sons-in-law whose wives are respondents herein, and two promissory notes, one in the sum of fifty-five hundred dollars and the other in the sum of twenty-two hundred dollars, executed respectively by two of his sons who are appellants herein.

Rudolph Hofmann and his wife, Rosina Hofmann, lived upon and managed the farm known as the home place until 1915 or 1916, when they retired and took up their residence in the town of Rosalia. From about that same time, or possibly a little later, until 1925 or 1926, the farm was operated by the son William. Thereafter and down to the time of Rosina Hofmann's death on December 30, 1941, Christ Hofmann, the youngest of the children, conducted the farm under a lease from his mother.

Sometime in the month of February, 1924, several weeks after the death of Rudolph Hofmann, all of the children, accompanied by all but one of their respective spouses, met with their mother at her home in Rosalia for the purpose principally of determining who should act as the administrator of their father's estate. Mrs. Hofmann, who was of

Swiss descent, was then sixty-seven years of age and spoke very little English. As a result of that conference, at which utmost harmony and good will prevailed among all concerned, Fred J. Hofmann, the oldest of the children, was chosen and was induced to act as administrator, and thereafter on February 18, 1924, was duly appointed and qualified as such.

At that same meeting, according to the testimony of the appellants, or within a period of a few months thereafter, according to the testimony of the respondents, it was agreed among all the parties concerned that the children would unite in conveying and transferring to their mother all their right, title, and interest in and to the estate of their father. It may be stated at this point that the sole question in dispute in this case is whether or not Rosina Hofmann, the mother, then and there or ever, in return for such promised conveyance and transfer, agreed to devise and bequeath her entire estate to her ten children, share and share alike, as contended by the respondents but controverted by the appellants.

The probate proceedings upon Rudolph Hofmann's estate were conducted by Mr. Thomas A. E. Lally, an attorney representing the administrator, Fred J. Hofmann. Pursuant to the above mentioned agreement on the part of the ten children, Mr. Lally, in September, 1924, during the progress of the probate proceedings, prepared a deed in which the children quitclaimed to their mother all their right, title, and interest in and to the assets, real and personal, of the estate of their father; the lands described in the deed were the same as those inventoried in the estate. The deed recited as consideration "the love and affection they [the children] have for the Party of the Second Part [their mother], and for other good and valuable and legal consideration to them in hand paid," and directed that after payment of the debts all of the assets and estate of Rudolph Hofmann be distributed to Rosina Hofmann. The execution of this quitclaim deed was completed by all the grantor children on October 11, 1924.

On December 6, 1924, a decree of distribution was entered in the estate of Rudolph Hofmann. The decree recited the execution and delivery of the above mentioned deed and then distributed the estate, one-half to Rosina Hofmann, the surviving widow, and an undivided one-twentieth to each of the ten children. Immediately following the entry of the decree, the quitclaim deed was filed in the auditor's office, and at the same time a written instrument showing receipt by all the heirs of their respective shares of the estate was filed with the clerk of the court.

On December 11, 1924, Rosina Hofmann executed a will which had been prepared for her by Mr. Lally. The will provided that, after payment of all her just debts, the remainder of her estate was to be distributed in equal shares to her ten children. The will further provided that from the share to be received by each there should be deducted any indebtedness owing to the testatrix by such child or by the husband or wife of such child. Expressing her full confidence in Fred J. Hofmann, her oldest son, she nominated him as the executor of her will, to act without bond and without the intervention of court except such as should be absolutely necessary under the laws of the state of Washington.

During the period between 1928 and the latter part of 1941, Mrs. Hofmann made substantial gifts of money, in equal shares, to all of her children. The first of these gifts, amounting to $5,000 to each child, was made in June, 1928; the second, amounting to $1,600, was made in January, 1936; the third, amounting to $1,455.12, was made sometime in 1938; the fourth, amounting to $300, was made during 1940; and the last gift, amounting to $50, was made in the fall of 1941. The total amount of these gifts to each child was $8,405.12. The money which Mrs. Hofmann thus periodically divided among her children was derived from the operation of the home place, the collection of certain indebtedness owing to her, and the sale of some of the real property which she then possessed. These gifts to the children were made either in cash or else by crediting pay-

ments on the obligations of those, or the spouses of those, who were indebted to her.

In 1937, Mrs. Hofmann gave up her residence in Rosalia and went to live with her oldest daughter, Liza Maurer, and her husband, L. A. Maurer, who then resided, and still reside, at Pasadena Park, in Spokane county. Mrs. Hofmann lived with this daughter and son-in-law until her death in December, 1941.

On June 29, 1939, while living with the Maurers, Mrs. Hofmann executed a second will, which Mr. Lally had drawn for her at her request. The provisions of that will were substantially the same as those of the first will, with this exception: The second will contained a provision giving to Christ Hofmann, the youngest son, the absolute right to purchase all of her real estate for the sum of twenty-two thousand dollars, the option to be exercised by him within one year after the admission of her will to probate; and the further provision that the twenty-two thousand dollars should be equally divided among all the children, or if the option were not exercised by Christ Hofmann, then the real estate itself should be so divided. At the time of the execution of the second will, the only real property owned by Mrs. Hofmann was the home place in Whitman county, which Christ Hofmann was then, and for many years had been, operating under a share-crop lease from his mother.

On October 6, 1939, Mrs. Hofmann executed and annexed to this second will a codicil which merely increased the option price of the land from twenty-two thousand to twenty-three thousand dollars.

Mrs. Hofmann died December 30, 1941. Her will was admitted to probate in Spokane county on February 10, 1942, and administration proceedings are now in progress. The complaint does not allege, nor does the record disclose, that Christ Hofmann exercised the option within the time permitted, or at all. If he did exercise it, then, in addition to the remainder of the estate, the twenty-three thousand dollars would be distributable as an asset, in ten equal shares, in place of the land itself.

Six of the surviving children, respondents herein, deeming the home place to be worth more than twenty-three thousand dollars, commenced this action on March 28, 1943, to compel the executor, Fred J. Hofmann, specifically to perform the alleged oral agreement of Rosina Hofmann, their mother, to devise and bequeath her entire estate equally among all of her ten children. Four of the surviving children, appellants herein, denying that any such agreement was ever made by their mother, refused to sanction or to join in such action as plaintiffs and were therefore made parties defendant.

At the conclusion of the trial and after argument upon the facts, as requested by the court, the cause was taken under advisement, upon the statement by the trial judge that he had no fixed view concerning the matter at that time and desired to give it further consideration. About a week later the judge filed his memorandum opinion, and thereafter the court entered its findings, conclusions, and decree granting the relief prayed for by the respondents.

There is no dispute herein as to the law governing the case; the controversy is entirely with reference to the facts. Preliminary to a consideration of the evidence, however, we may briefly state the rules of law applicable in such cases.

■ Since this is an action in equity, seeking specific performance of an alleged oral contract to devise, the matter is before this court for trial *de novo*. Rem. Rev. Stat., § 1736 [P. C. § 7321]; *Cushing v. Heuston,* 53 Wash. 379, 102 Pac. 29.

■ While, in equity cases, findings of fact made by the trial court are entitled to great weight, they are not binding on the supreme court, and the appellate tribunal has an independent duty to examine the entire evidence and the surrounding circumstances as disclosed by the statement of facts and from such examination determine what findings should have been made. *Columbia Lbr. Co. v. Bush,* 13 Wn. (2d) 657, 126 P. (2d) 584, and cases therein cited.

■ Oral contracts to devise or bequeath property, although they are not favored in law and are viewed with

suspicion by the courts, are nevertheless enforcible if the terms of the contract, the intention of the parties, and the adequacy of the consideration are established to the satisfaction of the court by the degree of proof required. *In re Fischer's Estate,* 196 Wash. 41, 81 P. (2d) 836, and cases therein cited; *Osterhout v. Peterson,* 198 Wash. 166, 87 P. (2d) 987.

■ To establish an oral contract to devise or bequeath property, the evidence must be conclusive, definite, certain, and beyond all legitimate controversy. *Resor v. Schaefer,* 193 Wash. 91, 74 P. (2d) 917; *Wayman v. Miller,* 195 Wash. 457, 81 P. (2d) 501; *In re Fischer's Estate, supra; Osterhout v. Peterson, supra; Thompson v. Weimer,* 1 Wn. (2d) 145, 95 P. (2d) 772; *Aho v. Ahola,* 4 Wn. (2d) 598, 104 P. (2d) 487; *Allen v. Dillard,* 15 Wn. (2d) 35, 129 P. (2d) 813; *Dau v. Pence,* 16 Wn. (2d) 368, 133 P. (2d) 523.

■ We now proceed to a consideration of the evidence. None of the six respondents herein testified upon the trial. This, no doubt, was because of the barrier erected by Rem. Rev. Stat., § 1211 [P. C. § 7722], which provides that, in an action or proceeding where the adverse party sues or defends as executor, administrator, or legal representative of any deceased person, a party in interest or to the record shall not be admitted to testify in his own behalf as to any transaction had by him with, or any statement made to him, or in his presence, by any such deceased person. Respondents' evidence upon the matter in controversy was adduced solely through the testimony of five of the spouses of the various respondent parties.

All five of those witnesses agreed with the appellants and their witnesses upon these three points: (1) that all the children were present at the meeting, referred to above, held at the home of Rosina Hofmann in Rosalia, in February, 1924, shortly after the death of their father, Rudolph Hofmann; (2) that at that meeting it was agreed that Fred J. Hofmann, the oldest son, should act as the administrator of their father's estate; and (3) that at that meeting no agree-

ment or suggestion was made that the mother, Rosina Hofmann, would or should make a will.

Respondents' witnesses testified, with some variance of detail, that *after* the probate proceedings had been instituted and after the administrator had been appointed, several meetings, numbering from two to four, were held at the home of Mrs. Hofmann, beginning in April, 1924, and continuing for several months thereafter; and that at one of these meetings Mrs. Hofmann asked the children to let her have the entire estate and, in substance, promised them that if they would comply with her request she would make a will leaving all of her property to them upon her death, share and share alike. It is impossible to tell from the record just what words are claimed to have been used by Mrs. Hofmann in expressing this idea. The conversations admittedly were informal and were conducted in the Swiss dialect or in the German language, or partly in each. It is also to be borne in mind that these conversations took place eighteen years prior to the time of the trial.

Some of these witnesses testified that Mrs. Hofmann used the word "will" or its German equivalent "testament," and that her statement was that "if the children signed their father's share of the property over to her for the duration of her life, she would make a will signing it all over to them, share and share alike." Others quoted her as saying that she wanted to keep all the property together as long as she lived, and that if the children "signed their estate over to her for the balance of her life, why after her death she would turn the property over equally to each child," through a will. It appears generally throughout the testimony of these witnesses that Mrs. Hofmann felt that the property in its entirety should be set over to her because she and her husband had worked long and hard to acquire it, and she wanted to retain it intact for the remainder of her life. Another reason for not disposing of it at once was that land was not saleable at that time.

The one outstanding feature in respondents' evidence, however, is that none of their witnesses testified that *all*

of the ten children were present at any one meeting when the purported agreement was made. The most that any witness would say was that a *majority* of the children were present upon such occasion, and the record is virtually without dispute that the only meeting where all were present was the one held in February, 1924, shortly after the death of the father. It is conceded that there is no written memorandum of any agreement by Mrs. Hofmann to make a will of any sort, and no wholly disinterested witness testified concerning any statement or admission by her with reference to any such agreement or intention.

On the other hand, four of the children, appellants herein, together with L. A. Maurer, the husband of Liza Maurer, testified specifically and positively that no such agreement as that asserted by the respondents was ever made, and that they had never heard of the purported "contract" until suggested by the respondents after their mother's death, eighteen years subsequent to the time the agreement is alleged to have been made. Respondents concede the competency of these witnesses under Rem. Rev. Stat., § 1211.

We here stress the fact that three of these latter witnesses, Fred J. Hofmann, Liza Maurer, and Frank Hofmann were testifying directly against their own financial interests, for if the alleged contract should be established they would profit thereby equally with the respondents, and if the alleged contract is repudiated they would similarly stand to lose equally with the respondents. The witness L. A. Maurer, a son-in-law, would likewise profit or lose indirectly through his wife, Liza Maurer.

These witnesses testified that there was but one meeting at which all the sons and daughters, together with their wives and husbands, with the exception of the son-in-law Ed Kernkamp, were present, namely, the meeting held in the home of Mrs. Hofmann in February, 1924; that at that meeting they first agreed upon the selection of Fred J. Hofmann as administrator of the father's estate; that the sons and sons-in-law then privately discussed among themselves the suggestion that the assets of the estate be turned

over to Mrs. Hofmann; that the matter was then immediately taken up with the daughters, who were there congregated, and that all the children agreed at that time that the transfer should be made; that there was no mention of any will to be executed by Mrs. Hofmann; and that there was no agreement on her part to devise her property in any manner whatever.

Fred J. Hofmann, the oldest son, the administrator of his father's estate, and the executor named in both of his mother's wills, as well as the business agent for his mother during her widowhood, further testified that, sometime after the proceedings in his father's estate had been concluded, his mother for the first time suggested to him that she desired to make a will and that she then wished to leave her property to her children equally; that he took her to Mr. Lally, who thereupon drew the will to that effect; that his mother delivered the will to him, the son, for safekeeping and that he had retained it ever since but had never spoken of its existence or contents to any of his brothers or sisters; that in the year 1938 his mother told him that she wanted her son Christ Hofmann to have the home place. His testimony on this last point was as follows:

"Q. Did she say how she wanted him to acquire that place at that time? A. She spoke about—why, she said that the rest all had places of their own and she felt sorry for Christ, that he didn't have none, so she said—she spoke about selling the land cheaper to him, or giving him a chance to buy it cheaper."

*Although the witness did not learn, until after his mother's death, that she had formally declared her wish in writing, the fact is that within about a year after the above conversation with him she executed the second will and, shortly thereafter, the codicil thereto.*

The testimony of the witness L. A. Maurer is especially convincing to us, not only because he testified against the interest of his wife, and indirectly against his own interest, but also because he appears to have had a more distinct

memory than did the other members of the family concerning the original agreement and a more intimate knowledge of Mrs. Hofmann's intentions.

He testified that at the meeting in February, 1924, all the children and their spouses, with the exception of Ed Kernkamp, were present at the home of Mrs. Hofmann in Rosalia; that in a discussion among the men of the family outside the house they first agreed that Fred J. Hofmann should act as administrator, and

"  .  .  .   then they talked about what to do with their father's estate, and I suggested that they turn it over to their mother.   I says, 'Your father and mother started on scratch, and they made that together, and it should be hers.' And the boys all agreed to that, every one of them.   And then they started to· talk something else, and I says, 'You go in the house now and talk with the girls, and talk it over with the girls, and see what they think of it.'   And so they went in."

He further testified that nothing whatever was said in that conference among the men about having Mrs. Hofmann make a will.   Later in the day, on their way home, his wife told him that the children had all agreed to turn over everything to their mother; in this, he was fully corroborated by his wife, Liza Maurer, the oldest daughter.

Mr. Maurer also testified that in 1939, while Mrs. Hofmann was living at his home, he took her and two prospective subscribing witnesses to Mr. Lally's office, at her request, for the purpose of making the second will.   His testimony with reference to that incident is as follows:

"Q.   State whether or not she ever told you that she wanted Christ to have the place that he was farming, the home place?   A. Well, she said that she—that was her husband's wish all the time that Christ should be on the place, and it was hers and she says, when she went to make that will, she said that she want to fix it so that Christ could have the place."

Mrs. Liza Maurer testified similarly concerning the same incident and further testified that her mother later told her that in her second will she had given her son Christ

Hofmann the option to purchase the home place for twenty-two thousand dollars, and in her codicil had increased the amount to twenty-three thousand dollars.

Had there been any prior agreement on the part of Mrs. Hofmann in 1924 to devise her property equally, as contended by the respondents, it would seem that Mr. and Mrs. Maurer would have remonstrated with Mrs. Hofmann upon her recent decision, or at least would have told the sisters and brothers something about it; but it is clear from the record that they did neither of those things. This, in our opinion, is persuasive evidence of their knowledge and belief that Mrs. Hofmann was not doing anything that she did not have the legal right to do; and their positive testimony is to the effect that there was never any agreement on the part of Mrs. Hofmann to make a will of any kind or to leave her estate to the ten children in equal shares.

Frank Hofmann, one of the appellants, corroborated the Maurers with respect to the absence of any agreement by Mrs. Hofmann to make such a will, and so did Christ Hofmann, although it may be conceded that he was an interested witness, inasmuch as he alone stands to profit by the action of his mother. It should be stated, however, in his behalf, that there is not the slightest intimation in the record that he ever did anything to induce such action by his mother, or that he knew anything about it until after her death.

Finally, Mr. Lally, who was the attorney for the family for eighteen years, and who drew both wills and the codicil to the second one, testified that he never heard of the purported contract until after the recent probate proceedings were commenced. Had there been such agreement it seems most probable that he would have been told about it at some time either by Mrs. Hofmann herself or at least by some of those vitally interested therein.

It is argued by the respondents that the execution of the first will by Mrs. Hofmann shortly after the termination of the probate proceedings in the estate of Rudolph Hofmann is strong evidence of her agreement to make such

will. Conceding the evidentiary value of the first will, we think the execution of the subsequent will and codicil must also be taken as similar evidence of the absence of any such agreement. The record is replete with expressions by the various sons and daughters of their abiding trust and confidence in their mother and of their belief throughout her lifetime that she would do the right thing by them. The record also fully justifies that confidence and belief. During the period of her life, following the death of her husband, Mrs. Hofmann divided as gifts among her children more than eighty thousand dollars, far in excess of the amount which was originally theirs by right of inheritance from their father's estate. Aside from the fact that Christ Hofmann may now obtain some advantage by exercising his option to purchase, Mrs. Hofmann's estate will be divided among all her children, share and share alike. It is not to be presumed nor lightly decided that this mother proved recreant to a solemn agreement made with her children. Rather should it be taken, in the absence of clear evidence to the contrary, that what she did violated no promise by her to them.

A careful study of the record convinces us not only that the respondents have failed to establish the alleged contract by evidence which is "conclusive, definite, certain, and beyond all legitimate controversy," but also that the preponderance of the evidence, taken in connection with the surrounding circumstances disclosed by the record, compels a finding that Mrs. Hofmann made no agreement to devise her property in equal shares to her children.

The judgment is reversed, with direction to the trial court to dismiss the action.

SIMPSON, C. J., MILLARD, JEFFERS, and MALLERY, JJ., concur.